# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FREDDIE CRESPIN,

*Petitioner-Appellee,*

v.

CHARLES L. RYAN; ATTORNEY
GENERAL FOR THE STATE OF
ARIZONA,

*Respondents-Appellants.*

No. 18-15073

D.C. No. 2:15-cv-00992-SPL

ORDER

Filed January 3, 2023

Before: Michael Daly Hawkins, Milan D. Smith, Jr., and
Andrew D. Hurwitz, Circuit Judges.

Order;
Dissent by Judge VanDyke

# SUMMARY[*]

## Habeas Corpus

The panel denied a petition for panel rehearing and denied on behalf of the court a petition for rehearing en banc.

Judge VanDyke, joined by Judges Callahan, Ikuta, Bennett, R. Nelson, and Bumatay, dissented from the denial rehearing en banc. Judge VanDyke wrote that the term "clearly established Federal law" under the Antiterrorism and Effective Death Penalty Act only refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions; and that the Supreme Court has emphasized that if this court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not "clearly established." Judge VanDyke wrote that this court has once again transgressed this command, this time by extending the rationale of *Miller v. Alabama*, 567 U.S. 460 (2012), which held that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders, to a case that involved a state with a discretionary sentencing scheme and a habeas petitioner who had accepted in his plea agreement a sentence of life-without-parole (LWOP). Judge VanDyke wrote that, even so, the panel improperly extended *Miller* as having "clearly established" that a non-mandatory LWOP sentence for juveniles—be it voluntary or discretionary—violates the Eighth Amendment; and that, particularly given the Supreme Court's repeated admonitions directed at this court

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

to stop misapplying AEDPA, the panel's improper extension of *Miller* merited en banc correction. He wrote that the court should have taken the case en banc to vacate the panel decision and dismiss the appeal as moot on account of Crespin's death.

---

## ORDER

The panel has voted to deny the petition for panel rehearing. The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. A majority of the non-recused active judges did not vote to rehear the case en banc. Fed. R. App. P. 35.

The petition for panel rehearing and rehearing en banc, Dkt. 65, is **DENIED**.

---

VANDYKE, Circuit Judge, with whom Judges CALLAHAN, IKUTA, BENNETT, R. NELSON, and BUMATAY join, dissenting from denial of rehearing en banc:

Because the Supreme Court has frequently needed to remind us, our court is well acquainted with the demanding standard for granting federal habeas relief from state court convictions. Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court may grant such relief for claimed constitutional violations only if the underlying state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application

of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The term "clearly established Federal law" only "refers to the holdings, as opposed to the dicta, of th[e] Court's decisions." *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (citation omitted). The Supreme Court has also emphasized that if our court "'must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established.'" *White v. Woodall*, 572 U.S. 415, 426 (2014) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)).

Our court has once again transgressed this command, this time by extending the rationale of *Miller v. Alabama*, 567 U.S. 460 (2012). *Miller* "h[e]ld that the Eighth Amendment forbids a *sentencing scheme* that *mandates* life in prison without possibility of parole for juvenile offenders." *Id.* at 479 (emphases added). That was not what this case presented to our court. Instead, in a state with a *discretionary* sentencing scheme, we were confronted with a habeas petitioner who had accepted in his *plea agreement* a sentence of life-without-parole (LWOP). Even so, the panel improperly extended *Miller* as having "clearly established" that a *non*-mandatory LWOP sentence for juveniles—be it voluntary or discretionary—violates the Eighth Amendment. Particularly given the Supreme Court's repeated admonitions directed at our court to stop misapplying AEDPA, the panel's improper extension of *Miller* merited en banc correction. *See, e.g.*, *Lopez v. Smith*, 574 U.S. 1, 6 (2014) (per curiam) ("We have before cautioned the lower courts—*and the Ninth Circuit in particular*—against 'framing our precedents at such a high level of generality.'" (emphasis added) (quoting *Nevada v. Jackson*, 569 U.S. 505, 512 (2013) (per curiam))); *Marshall*

*v. Rodgers*, 569 U.S. 58, 64 (2013) (per curiam) ("The [Ninth Circuit] Court of Appeals' … conclusion rested in part on the mistaken belief that circuit precedent may be used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced."). I respectfully dissent from our failure to do so.[1]

## I. BACKGROUND

### A. Factual History

Sixteen-year-old Freddie Crespin murdered Betty Janecke, the mother of his friend Barry Bjorgo, on August 31, 1995. Crespin struck Janecke in the head with a weight while her son strangled her with a belt and another friend held down her feet on her bed. Another co-conspirator later recalled that Betty had yelled, "I can help you guys, I can help you," and "Listen Barry, I am your mother, I can help you." The assailants discovered they had initially botched the murder because, a few minutes after they had emerged from Betty's room covered in blood, they heard noises coming from her room. Crespin finished the job by reentering with a knife and stabbing Betty repeatedly in the face through a pillow. Crespin took Betty's car and credit cards and drove to California, where he was apprehended and charged back in Arizona with multiple felonies including first degree murder.

At the time of Crespin's 1998 plea, the three sentences statutorily available for his crime were listed in his agreement: (i) "Death by Lethal Injection"; (ii) "Life

---

[1] The panel compounded its error when, upon learning of Crespin's death shortly after issuing its opinion, the panel declined to vacate its erroneous opinion as moot.

imprisonment without the possibility of parole (natural life)" (LWOP); or (iii) "Life imprisonment with no parole until at least 25 years have been served."

To avoid the possibility of the death penalty, Crespin pleaded guilty to first degree murder in exchange for an LWOP sentence. The pre-sentence report, which listed Crespin's date of birth, stated that "[t]he age of the defendant" was a mitigating factor, but noted as an aggravating factor that the offense had been committed in an "especially heinous and cruel manner." The report recommended LWOP as appropriate under the circumstances because: the murder was premeditated; it was "painfully evident that he ha[d] no remorse"; two psychological evaluators agreed he showed signs of "serious psychopathology and very little if any remorse"; and the psychologists agreed that Crespin was likely to commit more crimes of the same nature.

## B. Legal and Procedural History

Crespin's sentencing judge acknowledged he had discretion to reject the plea agreement if he found the stipulated sentence inappropriate. Ariz. R. Crim. P. 17.4(d). He explicitly found the sentence appropriate. The judge asked Crespin whether he had been "forced to enter into this plea agreement improperly by … [his] attorneys or anybody else." Having sought and obtained repeated confirmations that Crespin's plea was voluntary, the judge explained that "there is no sentence to be given other than what's called for in the plea agreement." In approving the plea deal and imposing the agreed-to sentence, the judge allowed family to speak, assured Crespin's attorney "I have reviewed the presentence report," and explained to Crespin and his mother that of the three available sentences, it was the judge's

"independent view of the underlying facts of this offense," as well as the "mitigating and aggravating factors," that LWOP was justified.

More than a decade later, the Supreme Court decided *Miller*. *Miller* concerned juveniles in two jurisdictions who, upon being convicted of murder, were given LWOP sentences mandated by their states' laws. 567 U.S. at 465–69. The Court was concerned that the "mandatory penalty schemes at issue here prevent the sentencer from taking account of" a defendant's "mitigating qualities of youth," and held that "mandatory [LWOP] sentences for juveniles violate[d] the Eighth Amendment." *Id.* at 470, 474–76 (internal quotations and citations omitted).

Crespin then filed a state petition for post-conviction relief arguing that, under *Miller*, his LWOP sentence violated the Eighth Amendment even though "Arizona does not have a mandatory statutory sentencing scheme." The reviewing court denied relief because Arizona's sentencing scheme was not mandatory. Crespin appealed to the Arizona Court of Appeals which rejected his arguments for several reasons: not only was LWOP not mandatory under Arizona law, but the sentencing judge had considered aggravating and mitigating factors before imposing the "second highest of the three penalties allowed and that [were] provided in [Crespin's] plea agreement." Crespin's petition for review was subsequently denied by the Supreme Court of Arizona.

Crespin then filed a federal habeas petition. During the pendency of that petition, the Supreme Court decided *Montgomery v. Louisiana*, 577 U.S. 190 (2016). As with *Miller*, *Montgomery* concerned a minor who, upon being convicted of murder, was mandatorily given an LWOP sentence by automatic force of state law, precluding any

sentencer from considering mitigating factors such as the defendant's youth. *Montgomery*, 577 U.S. at 194–95. Although Montgomery had been sentenced before *Miller* issued, the Court held that *Miller* announced a substantive rule requiring "a sentencer to consider a juvenile offender's youth and attendant characteristics," and that the rule applied retroactively. *Id.* at 195, 209–10, 212. In light of *Montgomery*, the federal district court granted habeas relief to Crespin in November 2017, holding that the Arizona court of appeals had unreasonably applied *Miller*.

A few years later, the Supreme Court decided *Jones v. Mississippi*, 141 S. Ct. 1307 (2021). Like its predecessor cases, *Jones* concerned a minor who, upon being convicted of murder, received a mandatory LWOP sentence. *Id.* at 1311–12. But when Jones was resentenced after *Miller*, the sentencing court declined to disturb the LWOP sentence after acknowledging that *Miller* required it to consider Jones's youth and holding that despite his youth, LWOP was still appropriate for Jones. *Id.* at 1311–13. The dispute in *Jones* was whether a sentencer's discretion to impose a lesser sentence satisfies *Miller*, or whether a sentencer must actively find a juvenile "permanently incorrigible" before imposing an LWOP sentence. *Id.* The Supreme Court clarified that no fact-finding requirement exists under *Miller* and *Montgomery*, that *Miller* only "required a discretionary sentencing procedure," and that the requirement that a sentencer consider a defendant's youth is implicitly satisfied when it has the discretion to do so. *Jones*, 141 S. Ct. at 1313–14, 1318–19.

The common denominator between *Miller*, *Montgomery*, and *Jones* is that they all concerned defendants whose mandatorily imposed LWOP sentences automatically flowed out of state law sentencing requirements. The

Supreme Court has clearly held that such regimes unconstitutionally deprive sentencers of the discretion to consider a defendant's age.

In August 2022, our court affirmed the district court in this case, concluding that Crespin's sentencer's discretionary adherence to a voluntary plea agreement in a state with multiple sentencing options violated *Miller*. *Crespin v. Ryan*, 46 F.4th 803, 810–11 (9th Cir. 2022). The panel relied heavily on the sentencer's statements that, notwithstanding the favorable testimony by Crespin's mother and letters submitted on his behalf, "there is no sentence to be given other than what's called for in the plea agreement," and again that "there is no option on the nature of the sentence." *Id.* at 806. Our court inferred from those statements that Crespin's sentencer was prevented from considering Crespin's youth as a mitigating factor. Our court tried to distinguish its decision from *Jones*—which it admits "narrowed the potential sweep," *id.* at 808, of the holdings in *Miller* and *Montgomery*—by construing *Jones* to support the proposition that all three cases mandated that sentencers must enjoy broad discretion to reduce LWOP sentences whenever a defendant's youth is a factor. *See id.* at 810–11.

Although the sentencer in this case was allowed by state law to reject the plea agreement if he found it inappropriate, our court was nonetheless dissatisfied with the remaining limitations on the sentencer: "The trial judge simply considered whether the stipulated LWOP sentence could be 'justified.' *Miller* requires more. Under *Miller*, a sentencer must also have the discretion to impose a lesser sentence than LWOP." *Id.* at 810–11. The panel further reasoned that "[a]lthough the judge had the discretion to determine whether this was a plea agreement that he *could* accept, he

did not have the discretion to choose which sentence he felt was *best* for Crespin." *Id.* at 811. Thus, purporting to directly apply *Miller*'s holding, the panel found that "[b]ecause the judge quite correctly recognized that his only sentencing option was LWOP, Crespin's sentencing violated the Eighth Amendment." *Id.*

The State of Arizona filed a petition for review en banc. One month later, the State of Arizona notified the court that Crespin had died. The panel "remand[ed] to the district court with instructions to dismiss the petition for writ of habeas corpus as moot," but nevertheless "decline[d] to vacate the filed opinion." That same day, the State of Arizona moved for vacatur, but the motion was denied by text order.

## II. ANALYSIS

AEDPA required our court to deny habeas relief, because the underlying state court proceedings did not "result[] in a decision that was contrary to, or involved an unreasonable application of," *Miller*'s holding. 28 U.S.C. § 2254(d)(1); *Musladin*, 549 U.S. at 74. Instead, in granting habeas relief our court extended *Miller*'s rationale to apply to a sentence imposed against the backdrop of a voluntary sentencing scheme. But the Supreme Court's holding in *Miller* is clear, and clearly not about sentences arising out of plea agreements: "the Eighth Amendment forbids a sentencing *scheme* that *mandates* [LWOP] for juvenile offenders." 567 U.S. at 479 (emphases added). *Miller*'s forty-two uses of the word "mandatory" in the majority opinion painstakingly underscore the limited nature of its

holding.[2]  And *Montgomery* and *Jones* likewise addressed only compulsory sentencing regimes, not plea agreements.

The contrasts between this case and the trifecta of *Miller*, *Montgomery*, and *Jones* are stark.  The latter cases all involved defendants who, following their murder convictions, automatically received LWOP as a minimum sentence under legal regimes that prevented sentencers from rejecting those sentences.  Those cases expressed no concern with plea agreements—which are by nature voluntary— much less plea agreements entered into against the backdrop of sentencing schemes that allow judges and juries to select from several sentences.

---

[2] *See, e.g.*, *Miller*, 567 U.S. at 465 ("We … hold that mandatory [LWOP] for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'"), 470 ("[M]andatory [LWOP] sentences for juveniles violate the Eighth Amendment."), 474 (explaining that "the mandatory penalty schemes at issue here prevent the sentencer from taking account of" youth's mitigating qualities), 476 ("[M]andatory penalties, by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it."), 477 ("Mandatory [LWOP] for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate the risks and consequences."), 478 ("[M]andatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it."), 479 ("We therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates [LWOP] for juvenile offenders."), 483 n.10 ("Here, we consider the constitutionality of mandatory sentencing schemes—which by definition remove a judge's or jury's discretion—so no comparable gap between legislation and practice can exist."), 487 ("[M]andatory [LWOP] for juveniles violates the Eighth Amendment."), 489 ("[T]he mandatory-sentencing schemes before us violate th[e] principle of proportionality, and so the Eighth Amendment's ban on cruel and unusual punishment.").

Nevertheless, our court attempted to shoehorn its decision into the holdings of *Miller*, *Montgomery*, and *Jones* by suggesting that Crespin's sentencer lacked a meaningful choice when he chose to accept the stipulated sentence, simply because his discretion to accept or reject the sentence, while not *removed* by law, was nonetheless *constrained* by the parties' agreement. *Crespin*, 46 F.4th at 810–11. By latching onto that one detail to the exclusion of all others, the panel ignored and extended the holding of *Miller*.

In so doing, our court committed several errors. First, Arizona's discretionary sentencing law is different from the mandatory regimes addressed by *Miller*, *Montgomery*, and *Jones*. The panel even acknowledged that "Arizona law provided three possible sentences for those convicted of first-degree murder," which included a lesser sentence of life with the possibility of release. *See id.* at 805–06 & n.1.

Second, the dissimilarities widen because unlike the defendants in *Miller*, *Montgomery*, and *Jones*, Crespin entered into a plea agreement that a judge had the *discretion* to reject. *See* Ariz. R. Crim. P. 17.4(d). Indeed, the sentencer accepted the agreed-to sentence as justified, expressly based on his "independent view of the underlying facts of [Crespin's] offense" and the "mitigating and aggravating factors." That is not the language of a sentencer foiled by a mandatory sentencing scheme; it is the language of a responsible judge weighing whether to accept a plea agreement on the understanding that multiple sentences were available. *Id.*

Third, even ignoring that those differences alone were more than enough to constitute an impermissible extension of *Miller* in violation of AEDPA, the differences are even more stark because Crespin's sentencing judge did, in fact,

take all the evidence into consideration, including Crespin's youth, before accepting the plea deal as justified. By accepting the plea deal, the judge simply endorsed a sentence that both parties had already agreed to. And if the sentencer had rejected the plea agreement because he disagreed with the sentence, the case would have gone to trial where a range of possible sentences awaited. *See Crespin*, 46 F.4th at 811.

Ultimately, a state's discretionary sentencing process does not somehow become a mandatory regime covered by *Miller* the moment the defendant is permitted to voluntarily pick a sentence that everyone (including the judge) agrees is appropriate. *Miller* nowhere "clearly established" that principle. *See Musladin*, 549 U.S. at 74. Our court's conclusion that "*Miller* requires more"—that a sentencing judge must have unlimited discretion to refashion a plea agreement "to choose which sentence he felt was *best*," *Crespin*, 46 F.4th at 811—is not even contemplated, much less required, by *Miller* or any of the other cases that our court purported to apply here.

*Miller*, *Montgomery*, and *Jones* are completely silent as to sentences imposed as part of a plea agreement. Only a transparent extension of those cases could support our court's conclusion in this case.

## III. CONCLUSION

Our court misapplied the facts of Crespin's record to a misinterpretation of *Miller* and its progeny that forcibly extends Supreme Court precedent, committing a clear violation of AEDPA. *Miller*, 567 U.S. at 479, 483 n.10, 489; *Montgomery*, 577 U.S. at 195; *Jones*, 141 S. Ct. at 1312. If our court's decision was so important that it merits continued publication notwithstanding Crespin's death, then surely it was important enough to get right. Instead, this decision

constitutes the latest in a regrettably long line of cases flaunting the Supreme Court's repeated admonitions, creating impermissible extensions of the Court's precedents. *See, e.g.*, *Lopez*, 574 U.S. at 6; *Marshall*, 569 U.S. at 64. We should have taken this case en banc to vacate the panel decision and dismiss the appeal as moot on account of Crespin's death.