**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROGER SCOTT HELM, Jr., | No. 22-15689 |
| *Petitioner-Appellant*, | D.C. No. |
| v. | 2:20-cv-02173-ROS |
| RYAN THORNELL, Director; KRISTIN MAYES, ATTORNEY GENERAL FOR THE STATE OF ARIZONA, | OPINION |
| *Respondents-Appellees*. | |

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, District Judge, Presiding

Argued and Submitted November 7, 2023
Phoenix, Arizona

Filed August 9, 2024

Before: Michael Daly Hawkins and Daniel P. Collins,
Circuit Judges, and Richard Seeborg,[*] District Judge.

Opinion by Judge Collins

---

[*] The Honorable Richard Seeborg, Chief United States District Judge for the Northern District of California, sitting by designation.

## SUMMARY[**]

### Habeas Corpus

The panel affirmed the district court's denial of Roger Scott Helm, Jr.'s habeas corpus petition in which he contended that his multiple consecutive terms of imprisonment for three homicides amount to the functional equivalent of a life-without-parole sentence in violation of *Miller v. Alabama*, 567 U.S. 460 (2012), which held that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on cruel and unusual punishments.

The panel concluded that, even assuming *arguendo* that Helm's term of incarceration is functionally a life-without-parole sentence, his *Miller* claim fails. As the Supreme Court recently clarified in *Jones v. Mississippi*, 593 U.S. 98, 106 (2021), *Miller* mandated only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a life-without-parole sentence. Because Helm's sentence was not mandatory and the trial judge had discretion to impose a lesser punishment in light of Helm's youth, his sentence complied with *Miller*.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Molly A. Karlin (argued), Assistant Federal Public Defender; Jon M. Sands, Federal Public Defender; Federal Public Defenders Office, Phoenix, Arizona; for Petitioner-Appellant.

Casey D. Ball (argued), Assistant Attorney General, Criminal Appeals Section; J.D. Nielson, Habeas Unit Chief; Kristin K. Mayes, Arizona Attorney General; Office of the Arizona Attorney General, Phoenix, Arizona; Linley Wilson, Assistant Attorney General, Arizona House of Representatives, Phoenix, Arizona; for Respondents-Appellees.

## OPINION

COLLINS, Circuit Judge:

Petitioner Roger Scott Helm, Jr., who murdered his adoptive parents and his stepsister in 1984 when he was 14 years old, appeals the district court's denial of his petition for a writ of habeas corpus. Helm contends that his multiple consecutive terms of imprisonment for the three homicides amount to the functional equivalent of a life-without-parole sentence in violation of *Miller v. Alabama*, 567 U.S. 460 (2012), which held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" *Id*. at 465.

We conclude that, even assuming *arguendo* that Helm's term of incarceration is functionally a life-without-parole sentence, his *Miller* claim fails. As the Supreme Court

recently clarified, "*Miller* mandated '*only* that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing' a life-without-parole sentence." *Jones v. Mississippi*, 593 U.S. 98, 106 (2021) (emphasis added) (quoting *Miller*, 567 U.S. at 483). "[B]ecause [Helm's] sentence was not mandatory and the trial judge had discretion to impose a lesser punishment in light of [Helm's] youth," his sentence complied with *Miller*. *Id*. at 120. On that basis, we affirm the district court's denial of Helm's petition.

## I

### A

In the early morning hours of April 29, 1984, when he was less than two months from his 15th birthday, Helm shot and killed his adoptive parents, Roger Scott Helm, Sr. and Rose Olivia Helm, while they were sleeping at home. Helm then shot and killed his stepsister Keli Ann Helm, dragged her body out to a shed, and allegedly sexually assaulted her. He went back to the house and stole money from his father's wallet and from the purses of his mother and stepsister. The bodies of all three victims were discovered after Rose Helm's brother-in-law called the police on April 30 to inform them that his wife, Rose's sister, had been repeatedly trying to reach Rose without success and that Roger Helm, Sr. had failed to report to work. Later that afternoon, Helm was arrested at a store after he allegedly attempted to cash a forged check that he had stolen from his father's business.

After Helm's case was transferred from juvenile court to adult court, Helm was indicted in August 1984 on three counts of first-degree murder, three counts of armed robbery, and one count of sexual assault. Helm ultimately pleaded guilty in November 1985, pursuant to a plea agreement, to

one count of first-degree murder (for killing Keli), two counts of second-degree murder (for killing his parents), and one count of armed robbery (for robbing his father). As to the first-degree murder count, the plea agreement stated that the death penalty would not be imposed and that the sentence for that count would therefore be life without any possibility of release before the completion of 25 years in prison. For the remaining counts, the plea agreement set forth the minimum, maximum, and "presumptive" sentences (which, for each count, were respectively 7 years, 21 years, and 10.5 years), and it also stated that Helm would not be eligible for parole on these counts until two-thirds of the prison sentence imposed had been served. In the plea agreement, the State also agreed not to charge Helm in connection with other conduct recounted in two specified sheriff's office reports, which described Helm's alleged physical and sexual assaults of two other inmates in the Maricopa County Jail.

After accepting the guilty pleas, the state trial court set a hearing to consider mitigating and aggravating factors in connection with Helm's sentencing. *See* ARIZ. REV. STAT. § 13-702 (1984) (listing specified aggravating and mitigating factors to be considered at the sentencing of first-time felony offenders). The evidentiary portion of the aggravation/mitigation hearing lasted two days and involved testimony from eight witnesses, including Helm. Several law enforcement witnesses testified about Helm's poor behavior in prison after his arrest and about other violent actions he had allegedly committed before his arrest. John Wagner, a criminal investigator for the Maricopa County Attorney's Office who had responded to the crime scene at the Helm home and participated in a jailhouse interview of Helm, also testified. Wagner described the crime scene in detail as well as what the investigation uncovered about the

number of times each victim was shot.  He also stated that, during questioning, Helm had confessed to the murders and that he had expressed no remorse.  Wagner said that Helm also admitted to sexually assaulting his sister, who was found in the shed "nude from about midbreast down," with "bloody hand prints all over her body."

The State also presented testimony from Dr. Aaron Canter, a clinical psychologist who had reviewed Helm's psychological records and the police reports, examined Helm for three hours, and administered several psychological tests to him.  Dr. Canter concluded that Helm had a "personality disorder" of the "passive-aggressive type, which is further complicated by his long-standing drug abuse."  Dr. Canter opined that "Helm is extremely dangerous to society in general" and was a "poor candidate for psychotherapy."  He described Helm's "shocking" "lack of empathy" and stated that, in his 35 years as a psychologist, Helm was "perhaps number three that would scare the bejabbers out of me in terms of his callousness, his potential dangerousness to other people, to society."  Although he could not say that there were no "rays of hope in terms of looking to help this young man," he confirmed that "the picture is a pretty grim and bleak one."  Dr. Canter also recounted that another colleague had accompanied him to the examination of Helm and that this colleague believed even more strongly that Helm was extremely dangerous and a poor candidate for rehabilitation.  During cross-examination, Helm's counsel asked Dr. Canter about treatment resources that might be available for Helm in prison in Arizona, and Dr. Canter acknowledged that they were "extremely meager."  He also stated, however, that even if Helm were offered the "optimum program as

currently exists" elsewhere in the United States, Helm's "prognosis would still be very poor."

Helm also took the stand at the hearing. Although he again admitted committing the murders, he denied having committed nearly all of the other violent acts that were raised in the testimony of the State's witnesses. Helm also said that he regretted committing the murders.

After the evidentiary hearing was concluded, the trial judge rejected Helm's request to proceed immediately with the sentencing. The court emphasized the importance of the decision, noting that if the court chose to "stack the sentences," Helm might "spend the rest of [his] life in prison," but that if the court did not stack them, then Helm might get only 25 years and would "have some of [his] lifetime out of prison." When Helm persisted in stating that he wanted to go forward with sentencing, the court stated, "Well, Mr. Helm, perhaps I'm taking this a little more seriously than you are right now. I do feel that it's in everybody's best interests, and, in particular, my best interests, because I've got to live with what my sentencing is, that I not proceed with the sentencing today." At that point, Helm's counsel asked for arguments on sentencing to be presented at a subsequent hearing, followed by sentencing the next day. The court agreed.

At the ensuing hearing, the court first rejected Helm's argument that Arizona law precluded the court from imposing consecutive sentences for murders committed as part of a single event. Defense counsel then argued that the court should nonetheless exercise its discretion to impose fully concurrent sentences. Defense counsel noted that, by virtue of the plea agreement, the sentence on the first-degree murder count had to be life without the possibility of parole

until 25 years had been served.  Defense counsel argued that, if it turned out to be true that Helm never improved or rehabilitated, then the life sentence would give "correctional" authorities the ability to hold "him forever anyway."  But, defense counsel contended, concurrent sentences would "at least give him the chance, if he is rehabilitated and treatable, to be released from prison some day."  Defense counsel also noted that the probation office recommended that the "presumptive" sentence of 10.5 years be imposed on each of the other three counts, with the second-degree murder counts to be concurrent to one another and the other counts to be consecutive.  Defense counsel stated that, as he understood the probation office's recommendation, it would produce a total minimum sentence of 46 years.

During defense counsel's argument, the trial court inquired about the subject of rehabilitation.  The court noted that the record contained an evaluation from another doctor who opined that Helm might benefit from "intensive psychotherapy," but the court also stated that the Arizona prison system did not provide such therapy and was unlikely to do so "in the foreseeable future."  The court also expressed concern that, despite the fact that drug abuse may have affected Helm's mental state at the time of the murders, Helm's testimony indicated that he still liked drugs.  In response, defense counsel reiterated that available treatments could change and, "if down the line [Helm] is treated and he improves, there is the chance . . . that he will get out of prison some day."  As counsel argued, he could not "help but think that as time goes by, the State of Arizona wouldn't provide some kind of program or treatment to help people like this."

In his sentencing arguments, the prosecutor criticized the probation officer's recommended sentence. According to the prosecutor, the two additional consecutive sentences of 10.5 years each would "convert[] to 14 years of hard time." This was a reference to the fact that, as noted in the plea agreement, Helm would be eligible for parole on the second-degree murder and robbery counts after serving two-thirds of the sentence. The prosecutor contended that, under the probation officer's proposed sentence, Helm would therefore be eligible for parole at age 53, which the prosecutor argued was "not sufficient." Instead, the prosecutor argued for three consecutive maximum sentences of 21 years each, for a total of 63 years, with eligibility for parole after serving 42 of those 63 years. The prosecutor argued that, when added to the 25 years Helm would have to serve on the first-degree murder count, these additional 42 years would ensure that Helm could not be released until he was "81 years old." The prosecutor argued that, in light of the aggravating factors and the poor prospects for rehabilitation, this maximum sentence was appropriate.

At the sentencing, the court found that Helm's age at the time of the crimes—14 years and 11 months—was a mitigating factor. The court found, as an additional mitigating factor, that Helm was under the influence of drugs at the time, which impaired to "some degree" his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." The court also found a number of aggravating factors, including that the crimes were done for pecuniary gain, that Helm was a "drug addict" and "not amenable to treatment," that he lacked genuine remorse for the crimes, and that Helm was an "extremely dangerous" person.

Weighing the aggravating and mitigating circumstances, the court imposed a sentence that was between what was recommended by the probation officer and what was requested by the prosecutor. Specifically, the court agreed with the prosecutor that the sentence on each of the second-degree murder and robbery counts should be 21 years, but the court did not run all four sentences consecutively. While the sentences on the three murder counts were consecutive to each other, the sentence on the robbery charge was ordered to be concurrent to the other sentences. The court also noted that, as to the second-degree murder and robbery counts, Helm would be eligible for parole after serving "two-thirds of each of these sentences." The result was a sentence of life with eligibility for parole after 25 years, followed by consecutive sentences totaling an additional 42 years.

Helm appealed directly to the Arizona Supreme Court, renewing his argument that, because "these crimes were committed on the same occasion," consecutive sentences were not available. The court unanimously rejected that argument, noting that the precedent on which it was based had recently been overruled.

Pursuant to the Interstate Corrections Compact, which allows States to transfer inmates between States to provide adequate care and rehabilitation, Arizona transferred Helm to a New Jersey state prison in 2002, where he has been ever since.

## B

In June 2013, Helm filed a successive pro se notice of post-conviction relief in Arizona state court, arguing that *Miller v. Alabama*, 567 U.S. 460 (2012), constituted a significant change in the law that invalidated his lengthy

sentence.[1]  Specifically, Helm argued that *Miller* invalidated "a sentencing scheme that mandates life in prison without possibility of parole for juvenile homicide offenders," and that his sentence was invalid under this rule.  In July 2013, the trial court rejected Helm's argument, holding that *Miller* was inapplicable because "[t]he sentencing scheme in place at the time of [Helm's] offense did not mandate life without the possibility of parole, nor is that the sentence imposed upon [Helm]."  After Helm moved for reconsideration, the court denied that request in December 2013.

On March 20, 2014, the Arizona Board of Executive Clemency granted Helm parole from his life sentence on the first-degree murder count, which triggered the first of his consecutive sentences for the second-degree murder counts.

In July 2015, Helm again requested reconsideration of the denial of post-conviction relief, arguing that recent caselaw made clear that his sentence was unlawful because it was "the functional equivalent of life without parole."  The trial court thereafter appointed counsel to confer with Helm and assess the viability of his claims.  Helm then filed a counseled petition for post-conviction relief, arguing that *Miller* was "a significant change in the law" that "would probably overturn [his] conviction or sentence."  The State opposed this petition, noting that Helm had not been subject to a mandatory sentence of life without parole because (1) the trial court had exercised discretion in making his sentences consecutive; and (2) Helm would be eligible for parole on each count, rendering him eligible for release as early as age 67.  The trial court denied Helm's petition,

---

[1] Helm had previously filed a state post-conviction petition in 1999 alleging ineffective assistance of counsel, but the petition was denied after an evidentiary hearing, and that denial was affirmed on appeal.

holding that Helm's lengthy sentence was not a mandatory one and that it did not constitute a "life sentence without the possibility of parole."

The Arizona Court of Appeals upheld the trial court's denial of relief in a published opinion. *See State v. Helm*, 431 P.3d 1213 (Ariz. Ct. App. 2018). The court did not address whether Helm was correct in contending that his consecutive sentences were "functionally" equivalent to "a life sentence without the possibility of release," because it held that, in any event, *Miller* does not apply to consecutive sentences. *Id*. at 1215. Chief Judge Eckerstrom dissented. *Id*. at 1216. Asserting that the record was insufficient to determine whether Helm was eligible for parole on the second-degree murder counts, he concluded that Helm's sentence was "plausibly" the functional equivalent of being "imprisoned without hope for release." *Id*. at 1216 & n.2. He contended that Helm was therefore "entitled to a *Miller* hearing" to determine the validity of his sentence. *Id*. at 1218. The Arizona Supreme Court summarily denied review in November 2020.

Helm then filed a counseled petition for a writ of habeas corpus in federal court. His sole argument was that his "aggregate sentence violates the Eighth Amendment to the U.S. Constitution" under *Miller* "because it is the functional equivalent of a sentence of life without parole and it was imposed without a determination that Mr. Helm's crime reflects permanent incorrigibility." The district court denied Helm's habeas petition. Applying the deferential review required by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d), the district court held that the Arizona Court of Appeals reasonably concluded "that *Miller* does not apply to consecutive sentences." The district court reached that conclusion even though it also

expressed doubts about the correctness of the Arizona appellate court's holding on that score. The district court further held, in the alternative, that "*Miller* applies only to mandatory life-without-parole sentences" and that Helm's lengthy sentence did not violate *Miller* because it was imposed as a discretionary matter.

The district court granted Helm a certificate of appealability, and we have jurisdiction under 28 U.S.C. §§ 1291 and 2253(a) over Helm's timely appeal.

## II

On appeal, Helm renews his claim that his Arizona sentences are invalid under *Miller*, which he contends establishes that the Eighth Amendment's ban on cruel and unusual punishments prohibits sentencing a juvenile offender to the functional equivalent of a life sentence without parole unless the sentencing court has "consider[ed] the qualities intrinsic to his youth and individualized to him." In addressing this claim, we begin by summarizing the Supreme Court's relevant jurisprudence leading up to and after *Miller*, and we then discuss how AEDPA's limitations apply to our review of the merits of Helm's claim.

## A

In *Graham v. Florida*, 560 U.S. 48 (2010), the Supreme Court addressed a claim that the Eighth Amendment categorically prohibits "a juvenile offender" from being "sentenced to life in prison without parole for a nonhomicide crime." *Id*. at 52–53. In considering this issue, the Court began by noting that it had not previously addressed "a *categorical* challenge to a term-of-years sentence." *Id*. at 61 (emphasis added). As the Court explained, its prior Eighth

Amendment cases had instead fallen into one of two categories. *Id*. at 59.

First, the Court has held that the Eighth Amendment prohibits the imposition of a "term-of-years sentence[]" that is "grossly disproportionate" in light of "all of the circumstances of the case." 560 U.S. at 59, 60 (citation omitted); *see Solem v. Helm*, 463 U.S. 277, 279, 303 (1983) (invalidating, as "significantly disproportionate" under the circumstances of the case, a "life sentence without possibility of parole for a seventh nonviolent felony"). Second, the Court has held that the Eighth Amendment imposes certain categorical limits on the use of the death penalty, with some based on "the nature of the offense" and others based on "the characteristics of the offender." *Graham*, 560 U.S. at 60; *see also Kennedy v. Louisiana*, 554 U.S. 407, 447 (2008) (holding that the Eighth Amendment reserves the use of the death penalty, "in cases of crimes against individuals, for crimes that take the life of the victim"); *Roper v. Simmons*, 543 U.S. 551, 578 (2005) (holding that the Eighth Amendment "forbid[s] imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed").

The claim in *Graham* did not fall into either category, because it involved a contention that the Eighth Amendment imposed an offender-based categorical limitation on a term-of-years sentence. *Graham*, 560 U.S. at 61. In resolving that claim, the Court applied the same sort of categorical analysis that it had employed in death-penalty cases such as *Roper* and *Kennedy*. *See Graham*, 560 U.S. at 61–62. After considering "objective indicia of national consensus," the Court concluded that the challenged "sentencing practice" was "exceedingly rare" and that "a national consensus ha[d] developed against it." *Id*. at 62, 67 (citation omitted). The

Court then considered whether the sentencing practice was categorically excessive in view of "the culpability of the offenders at issue in light of their crimes and characteristics"; "the severity of the punishment in question"; and "whether the challenged sentencing practice serves legitimate penological goals." *Id*. at 67.

As to culpability, the Court noted that "because juveniles have lessened culpability they are less deserving of the most severe punishments" and that "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." 560 U.S. at 68–69. "It follows," the Court concluded, "that, when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability." *Id*. at 69. With respect to the severity of the punishment, the Court stated that "[l]ife without parole is an especially harsh punishment for a juvenile." *Id*. at 70. Finally, the Court held that, "[w]ith respect to life without parole for juvenile nonhomicide offenders, none of the goals of penal sanctions that have been recognized as legitimate—retribution, deterrence, incapacitation, and rehabilitation—provides an adequate justification." *Id*. at 71 (citation omitted). Accordingly, the Court held that the Eighth Amendment "prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide." *Id*. at 82.

In reaching this conclusion, the *Graham* Court specifically rejected the view that it would be sufficient, for Eighth Amendment purposes, to "require[] courts," before imposing life without parole in a non-homicide case, "to take the offender's age into consideration as part of a case-specific gross disproportionality inquiry, weighing it against

the seriousness of the crime."  560 U.S. at 77.  The Court stated that it could not confidently conclude that "courts taking a case-by-case proportionality approach could with sufficient accuracy distinguish the few incorrigible juvenile offenders from the many that have the capacity for change." *Id*.  The Court also concluded that, due to "special difficulties encountered by counsel in juvenile representation," there was an unacceptable "risk that, as a result of these difficulties, a court or jury will erroneously conclude that a particular juvenile is sufficiently culpable to deserve life without parole for a nonhomicide."  *Id*. at 78–79.  "Finally," the Court stated, "a categorical rule gives all juvenile nonhomicide offenders a chance to demonstrate maturity and reform."  *Id*. at 79.

In *Miller*, the Court confronted a different type of Eighth Amendment claim—namely, whether that amendment prohibits the *mandatory* imposition of life without parole for a *homicide* offense committed by a youth.  567 U.S. at 465.  The Court held that, even though *Graham*'s "categorical bar" on life-without-parole sentences for youthful offenders applies "only to nonhomicide offenses," the broader reasoning in *Graham* confirmed that "youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole" for a homicide offense.  *Id*. at 473.  By "prevent[ing] the sentencer from taking account" of the offender's youth, a "mandatory" life-without-parole sentencing regime "contravenes" that "foundational principle" from *Graham*.  *Id*. at 474.

Moreover, given that life-without-parole sentences, like death sentences, are "irrevocable" and an "especially harsh punishment for a juvenile," the Court held that the imposition of such sentences for youthful offenses "ma[de] relevant here a second line of [Supreme Court] precedents,

demanding individualized sentencing when imposing the death penalty." 567 U.S. at 475. Applying the reasoning of those cases in light of *Graham*, the Court concluded that the sentencer must "have the ability to consider the 'mitigating qualities of youth.'" *Id*. at 476 (citation omitted). The Court therefore held "that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders," even for homicide offenses. *Id*. at 479. The Court emphasized, however, that, in contrast to *Graham*, it was not "foreclos[ing] a sentencer's ability" to impose life without parole in youthful *homicide* cases. *Id*. at 481. As the Court explained, its decision in *Miller* "retain[ed]" the "distinction" between "homicide and nonhomicide offenses": "*Graham* established one rule (a flat ban) for nonhomicide offenses, while [*Miller*] set[s] out a different one (individualized sentencing) for homicide offenses." *Id*. at 474 n.6.

Thereafter, in *Montgomery v. Louisiana*, 577 U.S. 190 (2016), the Supreme Court held that *Miller*'s holding applied retroactively to cases involving collateral challenges to life-without-parole sentences that were already final when *Miller* was decided. *Id*. at 212. The Court noted that, under *Teague v. Lane*, 489 U.S. 288 (1989), a habeas petitioner generally may not benefit from the application of a "new constitutional rule of criminal procedure" that was "announced" after the petitioner's conviction was final. *Montgomery*, 577 U.S. at 198. But the *Teague* bar is subject to two exceptions, one for "new substantive rules of constitutional law" and the other for "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Id*. (citations and internal quotation marks omitted). The *Montgomery* Court held that *Miller*'s

procedural requirement that "a sentencer . . . consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence" had a substantive component and was therefore a substantive rule entitled to retroactive effect. *Id*. at 209–10. As the Court explained, a *Miller* "hearing where 'youth and its attendant characteristics' are considered as sentencing factors" enforces the Eighth Amendment's *substantive* limits, because such a hearing "is necessary to separate those juveniles who may be sentenced to life without parole from those who may not." *Id*. at 210 (quoting *Miller*, 567 U.S. at 465). The Court emphasized, however, that "*Miller* did not impose a formal factfinding requirement" and therefore did not require a finding that a given youth's homicide offense reflected "transient immaturity" as opposed to "irreparable corruption." *Id*. at 211.

Finally, in *Jones v. Mississippi*, 593 U.S. 98 (2021), the Court reaffirmed that *Miller* does not require either "a separate factual finding that the defendant is permanently incorrigible" or "an on-the-record sentencing explanation with an implicit finding that the defendant is permanently incorrigible." *Id*. at 101. Rather, "[i]n *Miller*, the Court mandated '*only* that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing' a life-without-parole sentence." *Id*. (emphasis added) (quoting *Miller*, 567 U.S. at 483). The Court rejected the contention that *Miller* had established "permanent incorrigibility" as "an eligibility criterion" for a life-without-parole sentence for a youthful homicide offense. *Id*. at 108. Rather, *Miller* only "required that a sentencer consider youth as a mitigating factor when deciding whether to impose a life-without-parole sentence"

and did not require any express findings in support of such a decision.  *Id*. at 109.

The *Jones* Court acknowledged that *Montgomery* had characterized *Miller*'s procedural rule as "substantive for retroactivity purposes" on the ground that *Miller* protects underlying substantive limitations, but the Court held that nothing in *Montgomery* "impose[d] new requirements not already imposed by *Miller*."  593 U.S. at 110–11.  In a footnote, the Court called into question *Montgomery*'s reliance, in characterizing *Miller* as substantive, on the fact that *Miller* protected an "underlying" substantive constitutional right.  *Id*. at 110 n.4.  As the Court explained, in "cases both before and after *Montgomery*, the Court determines whether a rule is substantive or procedural for retroactivity purposes 'by considering the *function* of the rule' itself—not 'by asking whether the constitutional right underlying the new rule is substantive or procedural.'"  *Id*. (emphasis added) (quoting *Welch v. United States*, 578 U.S. 120, 130–31 (2016)).  The Court stated that "to the extent that *Montgomery*'s application of the *Teague* standard is in tension with the Court's retroactivity precedents that both pre-date and post-date *Montgomery*, those retroactivity precedents—and not *Montgomery*—must guide the determination of whether rules other than *Miller* are substantive."  *Id*.  With that clarification, the Court nonetheless left undisturbed "*Montgomery*'s holding that *Miller* applies retroactively on collateral review," noting that "[b]y now, most offenders who could seek collateral review as a result of *Montgomery* have done so and, if eligible, have received new discretionary sentences under *Miller*."  *Id*.

**B**

Against this backdrop, we turn to Helm's specific claim in this case and how AEDPA affects our review of the state court's rejection of that claim.

**1**

Helm's *Miller* argument proceeds in two steps. First, Helm argues that his aggregate consecutive sentences for multiple crimes amount to a required minimum term of incarceration that "exceeds his life expectancy" and that this sentence is therefore the functional equivalent of a life-without-parole sentence for homicide offenses committed as a minor. As such, Helm argues, his sentence is subject to *Miller*. Second, Helm argues that his sentence violates *Miller*, because the state trial court assertedly took into account the resource constraints of the Arizona prisons in concluding that the youthful Helm's prospects for future rehabilitation were poor.

In rejecting Helm's *Miller* claim, the Arizona Court of Appeals reached only the first question and not the second. Specifically, the court held that neither *Graham*, *Miller*, nor *Montgomery* "addressed consecutive sentences imposed for multiple murders" and that "cumulative sentences that result in an aggregate prison term that exceeds a juvenile's life expectancy" are not subject to the limits established by *Graham* or *Miller*. *Helm*, 431 P.3d at 1215–16. Because the Arizona appellate court concluded that *Miller* did not apply, it did not address whether Helm's sentence was otherwise consistent with *Miller*. By contrast, the district court concluded that, with respect to both steps of his argument, Helm failed to make the necessary showing to obtain habeas relief, and the State similarly argues in the alternative on appeal.

In evaluating the merits of Helm's *Miller* claim, the standard of review that we apply differs depending upon which ground we consider. Under AEDPA, we may set aside the Arizona court's conclusion that *Miller* has no threshold application to Helm's sentence only if that decision either (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

But even if we were to conclude that AEDPA's standards were met and that the Arizona court's refusal to apply *Miller* to Helm's sentence was unreasonable, that is not enough to establish that Helm is entitled to habeas relief based on *Miller* error. AEDPA's limits in § 2254(d) establish that habeas relief "shall *not* be granted" unless one of the above-described conditions is satisfied, but the satisfaction of one or both of those conditions—and the resulting removal of AEDPA's *prohibition* on habeas relief—will not always be enough to justify an *affirmative grant* of habeas relief. *Frantz v. Hazey*, 533 F.3d 724, 736–37 (9th Cir. 2008) (en banc). To be sure, in cases where (for example) the state court decided the merits of the only ground at issue in a constitutional claim, "a holding on habeas review that a state court error meets the § 2254(d) standard will often simultaneously constitute a holding" that affirmative habeas relief is warranted. *Id*. at 736. But where the state court rejected only *one* element of the petitioner's required showing to establish a constitutional claim, then satisfaction of § 2254(d)'s standards as to that one element will not be enough to establish that the petitioner "is in custody *in violation of the Constitution* or laws or treaties of the United

States." *Id*. (emphasis added) (quoting 28 U.S.C. § 2241(c)(3)). In such a case, affirmative habeas relief cannot be granted unless the other elements of the constitutional claim are established as well. *Id*. at 736–37. However, where the state court did not reach those additional elements, our review as to those issues would be de novo and not the deferential review applicable under AEDPA to merits issues actually decided by the state court. *Id*. at 736.

Where, as here, a petitioner must clear two hurdles in order to obtain affirmative habeas relief on the merits, we may uphold a denial of relief on either ground. *See Frantz*, 533 F.3d at 737 (citing *Inthavong v. Lamarque*, 420 F.3d 1055, 1061 (9th Cir. 2005)). It might be expected that, ordinarily, the ground that is reviewed deferentially under AEDPA will provide the clearest ground for denying relief. But here, the parties vigorously dispute whether the Arizona Court of Appeals' holding that *Graham* and *Miller* are categorically inapplicable to consecutive sentences, *Helm*, 431 P.3d at 1215, is consistent with our holding in *Moore v. Biter*, 725 F.3d 1184 (9th Cir. 2013).

In *Moore*, we addressed a 254-year aggregate of consecutive sentences imposed for multiple non-homicide offenses committed as a minor, and we held that the aggregate prison term was the equivalent of a life-without-parole sentence forbidden by *Graham*. 725 F.3d at 1186, 1191–92. The State argues that *Moore* is not controlling under AEDPA's deferential review because *Moore* did not involve multiple homicides and, in any event, is not "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Moreover, the parties further dispute whether the Arizona Court of Appeals made a finding as to when Helm would be eligible for parole on the second-degree murder counts and,

if so, whether that finding was reasonable. We need not resolve these disputes. Even if we assume *arguendo* that Helm has established that the Arizona Court of Appeals unreasonably held that *Miller* does not apply to consecutive sentences for multiple homicides, and even if we assume that Helm's parole eligibility is so far off in the future that his sentence is functionally a life-without-parole sentence, we conclude that his claim still fails because his sentence is fully consistent with the requirements of *Miller*.

As we have explained, in considering this alternative ground for denying habeas relief, we cannot apply AEDPA's deferential standards, because the ground is one whose merits were never considered by the state court. *See Frantz*, 533 at 735; *see also Porter v. McCollum*, 558 U.S. 30, 39 (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005). Because we apply "the pre-AEDPA habeas review standard" in addressing this question, *Frantz*, 533 F.3d at 736, our review is de novo and is not limited to considering only "clearly established" law as "determined by the Supreme Court of the United States" at the time of the state court's decision. 28 U.S.C. § 2254(d)(1).

Moreover, although *Teague*'s anti-retroactivity rule is part of the pre-AEDPA law that we must apply in considering this aspect of Helm's *Miller* claim, the Supreme Court has squarely held that *Teague* does not bar the application of subsequent precedent that requires the *rejection* of a habeas petitioner's claim on the merits. *Lockhart v. Fretwell*, 506 U.S. 364, 372–73 (1993); *see also Wedra v. Lefevre*, 988 F.2d 334, 341 (2d Cir. 1993). That makes perfect sense because, if current caselaw makes clear that the petitioner's constitutional claim is actually meritless, then there is no sense in which the petitioner "is in custody

in violation of the Constitution," and there is no basis for habeas relief. 28 U.S.C. § 2241(c)(3).

## 2

Applying de novo review, we conclude that, under the Supreme Court's more recent decision in *Jones v. Mississippi*, Helm's *Miller* claim is without merit.

*Jones* squarely held that "the *Miller* Court mandated '*only* that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing' a life-without-parole sentence" and that, under *Miller*, the trial court need not make either explicit or even "implicit" findings of incorrigibility before imposing a life-without-parole sentence. *Jones*, 593 U.S. at 108, 115 (emphasis added) (quoting *Miller*, 567 U.S. at 483). Having clarified what *Miller* requires, the *Jones* Court then rejected the *Miller* claim asserted by the petitioner in that case (Jones). *Id*. at 120. Specifically, *Jones* held that the *Miller* line of cases "require[s] a discretionary sentencing procedure in a case of this kind," and "[t]he resentencing in Jones's case complied with those precedents because the sentence was not mandatory and the trial judge had discretion to impose a lesser punishment in light of Jones's youth." *Id*.

That holding squarely governs this case. Here, the imposition of multiple consecutive sentences was not mandatory, and the central disputed issue in Helm's multi-day sentencing proceedings was whether the trial court should make Helm's sentences run concurrently or consecutively in whole or in part. As our earlier summary of Helm's sentencing proceedings confirms, the trial judge explicitly acknowledged on the record that he had discretion to run all of Helm's sentences concurrently, such that Helm

might be incarcerated for only 25 years and would "have some of [his] lifetime out of prison." *See supra* at 7. Moreover, the trial judge, in sentencing Helm as he did, explicitly stated that he took into account, as a mitigating factor, the fact that Helm was not yet 15 years old at the time of the murders.**[2]** Helm thus received a "discretionary sentencing procedure," and *Miller* requires no more. *Jones*, 593 U.S. at 118; *see also Bell v. Uribe*, 748 F.3d 857, 870 (9th Cir. 2014) (rejecting the petitioner's challenge to his life-without-parole sentence for a homicide committed as a minor, holding that "[b]ecause the sentencing judge did consider both mitigating and aggravating factors under a sentencing scheme that affords discretion and leniency, there is no violation of *Miller*").

Helm nonetheless argues that his sentence violates *Miller* because the trial court's weighing of Helm's youth was allegedly tainted by what he describes as "the State's assertion it had not and would not expend the resources necessary to rehabilitate violent juvenile offenders like him." This contention is refuted by *Jones*. As the Supreme Court clarified in that case, *Miller* requires a "discretionary sentencing procedure," but it does not require that a state court's weighing of the mitigating factors associated with

---

[2] That distinguishes this case from *McKinley v. Butler*, 809 F.3d 908 (7th Cir. 2016), on which Helm relies. There, the Seventh Circuit found a *Miller* error where, in imposing sentence, the trial judge "said nothing to indicate that he considered the defendant's youth to have the slightest relevance to deciding how long to make the sentence." *Id*. at 910. In any event, *McKinley*'s requirement of an on-the-record confirmation of the court's consideration of youth is directly contrary to the Supreme Court's subsequent holding in *Jones* that a "sentencing explanation is . . . not necessary to ensure that the sentencer in juvenile life-without-parole cases considers the defendant's youth." *Jones*, 593 U.S. at 116.

youth be conducted in accordance with any particular *substantive* criteria of incorrigibility. *Jones*, 593 U.S. at 120–21.

Because Helm's sentence complied with *Miller*'s requirements, we affirm the district court's denial of Helm's petition for a writ of habeas corpus.

**AFFIRMED.**