IN THE SUPREME COURT OF NORTH CAROLINA

No. 297PA18

Filed 21 March 2025

STATE OF NORTH CAROLINA

v.

ANTWAUN KYRAL SIMS

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 260 N.C. App. 665 (2018), finding no error after an appeal from an order entered on 21 March 2014 by Judge Jack W. Jenkins in Superior Court, Onslow County.  Heard in the Supreme Court on 9 April 2024.

*Jeff Jackson, Attorney General, by Kimberly N. Callahan, Assistant Attorney General, for the State.*

*Glenn Gerding, Appellate Defender, by David W. Andrews, Assistant Appellate Defender, for defendant.*

BERGER, Justice.

Defendant was sentenced to life in prison without parole for his actions in the abduction and murder of Ms. Elleze Kennedy.  Defendant was seventeen years old at the time of the murder.  In motions for appropriate relief filed with the sentencing court, defendant made two primary arguments: (1) that gender bias in jury selection pursuant to *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) entitles him to a new trial; and (2) that his sentence of life in prison without parole runs counter to the constitutional requirements set forth in *Miller v. Alabama,* 567 U.S. 460 (2012) and

N.C.G.S. §§ 15A-1340.19A to -1340.19D. Defendant's *J.E.B.* claim is procedurally barred, and we affirm the Court of Appeals judgment holding that there was no error in defendant's sentence of life without parole.

## I.    Factual and Procedural Background

Eighty-nine-year-old Elleze Kennedy was abducted from her driveway and murdered by defendant and his co-defendants on 3 January 2000. At trial, the State's evidence tended to show that co-defendant Christopher Bell told Chad Williams and defendant that he wanted to steal a vehicle and flee the state to avoid a pending probation violation hearing. Defendant and Williams agreed to help Bell.

The three identified Ms. Kennedy as their target and followed her home, where they confronted her with a BB gun and demanded that she turn over her car keys. When Ms. Kennedy resisted, Bell hit her repeatedly in the face with the gun until she was unconscious. Defendant drove Ms. Kennedy's vehicle away after she was thrown into the back seat of the car. She was later moved to the trunk of the vehicle.

Defendant and his co-defendants stopped to smoke marijuana and left Ms. Kennedy in the trunk. While there, Williams said he was not going to travel out-of-state in a stolen vehicle with Ms. Kennedy in the trunk. In response, Bell and defendant left Williams at the house. They later returned and convinced Williams to get back into the car by telling him that they had dropped Ms. Kennedy off at a McDonalds. Before leaving the house, defendant obtained a rag and cleaned Ms. Kennedy's blood from the backseat of the vehicle.

Williams thereafter discovered that Ms. Kennedy was still in the trunk of the car, but he remained with the group. At defendant's urging, the men drove the car to a field, parked the car, and opened the trunk. Ms. Kennedy was moving around and moaning in pain. Williams suggested they let her go, but Bell replied that Ms. Kennedy had seen his face and he was going "to leave no witnesses." Bell asked defendant for his lighter so that he could burn his blood-covered jacket. Bell threw the burning jacket into the backseat of the car while Ms. Kennedy was still alive in the trunk.

The next morning, Bell asked defendant to go check to see if Ms. Kennedy was dead, and Bell stated that if she was not, defendant should burn the rest of the car. Defendant discovered that Ms. Kennedy was dead in the trunk of the car and that the windows of the car were smoked. In an attempt to cover up the evidence, defendant and Bell wiped the car down intending to remove fingerprints and then left the scene.

Police discovered the stolen car with Ms. Kennedy's body in the trunk that same morning. Among the evidence obtained at the crime scene were footprint markings on the ground around the car, Bell's burned jacket, the cloth defendant used to wipe up Ms. Kennedy's blood, latent fingerprints on the car, and hairs in the back seat, which were matches to defendant and Bell. Upon searching Ms. Kennedy's residence, police discovered a puddle of blood in the driveway, a pair of eyeglasses, a dental partial, a walking cane, and blood smear marks on the driveway consistent

with dragging.

An autopsy report revealed that Ms. Kennedy suffered blunt force injuries to her face, which resulted in facial fractures and loosened teeth. In addition, Ms. Kennedy's body had extensive bruising of her torso consistent with being kicked. The extent of soot in Ms. Kennedy's trachea and lungs led to the conclusion that she was alive at the time that the car was burned but that she ultimately succumbed to carbon monoxide poisoning.

Williams was questioned by police and confessed to his involvement and the role of his co-defendants in Ms. Kennedy's murder. Williams pleaded guilty to first-degree murder, first-degree kidnapping, and assault with a deadly weapon inflicting serious injury, and he agreed to testify against defendant and Bell at trial.

Defendant and Bell were arrested and subsequently indicted for first-degree murder, first-degree kidnapping, assault with a deadly weapon inflicting serious injury, and burning personal property. The State revealed its intent to seek the death penalty against both defendant and Bell, and their matters were joined for trial. On 14 August 2001, an Onslow County jury found defendant and Bell guilty of first-degree murder under the theories of felony murder and premeditated and deliberated murder. Defendant was also convicted of first-degree kidnapping and burning of personal property.

Following the capital sentencing hearing, defendant was sentenced to life in prison without parole, followed by consecutive sentences totaling 108 to 139 months

in prison. Bell was sentenced to death. Both defendant and Bell appealed their convictions.

On 18 November 2003, the Court of Appeals held that there was no error in defendant's conviction and sentence and concluded that defendant received a fair trial free of prejudicial error. *State v. Sims*, 161 N.C. App. 183, 196 (2003). This Court upheld Bell's convictions and death sentence on 7 October 2004. *State v. Bell*, 359 N.C. 1 (2004), *cert. denied*, 544 U.S. 1052 (2005).

On 8 April 2013, defendant filed a motion for appropriate relief in superior court, arguing that his sentence of mandatory life imprisonment without parole as a juvenile was unconstitutional under *Miller*, 567 U.S. 460. On 2 July 2013, defendant's motion was granted, and a resentencing hearing was ordered pursuant to this state's *Miller*-fix statute. *See* N.C.G.S. § 15A-1340.19B (2023). On 20 February 2014, the resentencing hearing was held before the Honorable Jack W. Jenkins, and the MAR court[1] determined that defendant's sentence of life without parole was to remain in place.

On 9 September 2016, defendant filed a petition for writ of certiorari with the Court of Appeals seeking review of the MAR order. The Court of Appeals allowed defendant's petition and subsequently issued a published decision holding there was no error. *State v. Sims*, 260 N.C. App. 665, 682-83 (2018). Specifically, the Court of Appeals determined that the sentencing court did not abuse its discretion in weighing

---

[1] The MAR court is hereinafter referred to as the sentencing court as appropriate.

the *Miller* factors and resentencing defendant to life without parole. *Id.* at 682.

On 11 September 2018, defendant filed with this Court a notice of appeal based upon a constitutional question and a petition for discretionary review. On 7 December 2018, this Court dismissed defendant's notice of appeal based upon a constitutional question but allowed the petition for discretionary review to address whether the Court of Appeals erred in upholding defendant's life without parole sentence under *Miller*.

In addition, on 8 October 2019, while the appeal was pending before this Court, defendant filed another motion for appropriate relief, asserting for the first time a claim of gender-discrimination during jury selection under *J.E.B.*, 511 U.S. 127. Consequently, this Court entered an order remanding the case to the Superior Court, Onslow County, for an evidentiary hearing. This Court also remanded co-defendant Bell's case to the Superior Court, Onslow County, for a joint evidentiary hearing with defendant.

On 25 January 2022, the superior court issued an order finding that the State's use of a peremptory strike for juror Viola Morrow violated *J.E.B.* We then ordered supplemental briefing in both cases regarding the merits of their *J.E.B.* claims. We address both issues below.

## II.     Analysis

**A. *J.E.B.* Claims**

Section 15A-1419 "provides a mandatory procedural bar for issues a party seeks to litigate in post-conviction proceedings." *State v. Tucker*, 385 N.C. 471, 484 (2023), *cert. denied*, 145 S. Ct. 196 (2024). The procedural bar precludes review when, relevant here, "[u]pon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so." N.C.G.S. § 15A-1419(a)(3) (2023). "[I]t is well settled that constitutional matters that are not raised and passed upon at trial will not be reviewed for the first time on appeal[.]" *State v. Garcia*, 358 N.C. 382, 420 (2004).

"An exception to the procedural bar applies only if the defendant can demonstrate: (1) '[g]ood cause for excusing the ground for denial listed in subsection (a) of this section and ... actual prejudice resulting from the defendant's claim,' or (2) '[t]hat failure to consider the defendant's claim will result in a fundamental miscarriage of justice.'" *Tucker*, 385 N.C. at 485 (alterations in original) (quoting N.C.G.S. § 15A-1419(b) (2021)).

"[G]ood cause" only exists if the defendant demonstrates "by a preponderance of the evidence that his failure to raise the claim or file a timely motion" was:

> (1) The result of State action in violation of the United States Constitution or the North Carolina Constitution including ineffective assistance of trial or appellate counsel;
>
> (2) The result of the recognition of a new federal or State right which is retroactively applicable; or
>
> (3) Based on a factual predicate that could not have been discovered through the exercise of reasonable diligence in

time to present the claim on a previous State or federal postconviction review.

N.C.G.S. § 15A-1419(c) (2023).

"[A] fundamental miscarriage of justice" under subsection (b)(2) is established only when a defendant demonstrates by a preponderance of the evidence that "but for the error, no reasonable fact finder would have found the defendant guilty of the underlying offense"; or, when reviewing a death sentence, a defendant demonstrates "by clear and convincing evidence that, but for the error, no reasonable fact finder would have found the defendant eligible for the death penalty." N.C.G.S. § 15A-1419(e) (2023).

Similar to his co-defendant in *State v. Bell*, No. 86A02-2 (N.C. Mar. 21, 2025), defendant makes no argument that failure to consider his *J.E.B.* claim will result in a fundamental miscarriage of justice. Defendant instead argues that he was "[u]ltimately . . . not in a position to assert a violation of *J.E.B.* in his direct appeal[.]" Defendant acknowledges in his brief to this Court that his *J.E.B.* argument was neither raised at trial, nor argued on direct appeal, but he contends that because the prosecutor's affidavit[2] was not released until well after the trial, he could not have discovered it through reasonable diligence.

For the reasons stated in this Court's opinion filed today in his co-defendant's matter, *see State v. Bell*, No. 86A02-2 (N.C. Mar. 21, 2025), and based upon a fair

---

[2] For background information on this affidavit, see *State v. Bell*, No. 86A02-2 (N.C. March 21, 2025).

consideration of the record, defendant's *J.E.B.* claim is procedurally barred pursuant to N.C.G.S. § 15A-1419. *See Tucker*, 385 N.C. at 484-86.

## B. Defendant's LWOP Sentence

Defendant poses two challenges to the sentencing court's 21 March 2014 order affirming his sentence of life without parole. First, defendant asserts that the sentence violates the Eighth Amendment because defendant "showed that he was not irreparably corrupt and that his role in Ms. Kennedy's murder was the result of transient immaturity." Second, defendant contends that the Court of Appeals erred when it determined that the sentencing court did not abuse its discretion when considering mitigating evidence presented by defendant. Related thereto, defendant also contends that this matter should be remanded to the Court of Appeals because that court failed to apply relevant legal standards in rendering its opinion.

For each of his arguments, defendant essentially asks this Court to reweigh evidence, and for the reasons discussed below, we affirm defendant's sentence of life in prison without parole.

### 1. Constitutional Principles

"Absent specific authority, it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence; rather, in applying the Eighth Amendment the appellate court decides only whether the sentence . . . is within constitutional limits." *State v. Ysaguire*, 309 N.C. 780, 786 (1983) (quoting *Solem v. Helm*, 463 U.S. 277, 290 n.16 (1983)). Moreover,

"[i]n non-capital cases we do not, and are not required to, conduct factual comparisons of different cases to determine whether a given sentence is constitutional." *Id.* at 786 n.3.

The Eighth Amendment guarantees the right to be free from "cruel and unusual punishments." U.S. Const. amend. VIII. The Supreme Court of the United States has opined that this right "flows from the basic precept of justice that punishment for crime should be graduated and proportioned to both the offender and the offense." *Miller*, 567 U.S. at 469 (cleaned up). Because of the inherent differences between juveniles and adults, "children are constitutionally different from adults for purposes of sentencing." *Id.* at 471. *But see State v. Tirado*, No. 267PA21 (N.C. Jan. 31, 2025) (holding that Article I, Section 27 of our state constitution does not provide juveniles with the more robust sentencing protections the Supreme Court of the United States has developed in its Eighth Amendment jurisprudence and is to be read consistent with the Eighth Amendment).

In 2012, the Supreme Court of the United States struck down sentencing schemes which imposed mandatory sentences of life without parole for juveniles without first allowing a sentencing court to consider the "mitigating qualities of youth." *Miller*, 567 U.S. at 476 (cleaned up). According to *Miller*, a sentencing court must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480. This requires a sentencing court to consider each individual defendant and "take into account the

differences among defendants and [their] crimes." *Id.* at 480 n.8. Foundationally, *Miller* permits sentences of life without parole for juvenile murderers provided the sentencing court (1) considers a defendant's youth in mitigation, and (2) has discretion to impose a punishment other than life without parole. *See id.*

The Supreme Court subsequently clarified that *Miller* does not create an outright ban on juvenile life-without-parole sentences, but it does prohibit such sentences "for all but the rarest of juvenile offenders, those whose *crimes* reflect permanent incorrigibility." *Montgomery v. Louisiana*, 577 U.S. 190, 209 (2016) (emphasis added). The Court also concluded that "a finding of fact regarding a child's incorrigibility . . . is not required." *Id.* at 211.

The Supreme Court recently reiterated that all a sentencing court must do to comply with the Eighth Amendment is "follow a certain process—considering an offender's youth and attendant characteristics—before imposing" a particular penalty. *Jones v. Mississippi*, 141 S. Ct. 1307, 1311 (2021) (quoting *Miller*, 567 U.S. at 483). *See also United States v. Holt*, 116 F.4th 599, 607 (6th Cir. 2024) ("If sentencing courts consider a juvenile defendant's youth as one factor in the sentencing calculus, *Miller* does not prohibit the court from imposing a life sentence as a 'discretionary' matter."); *Helm v. Thornell*, 112 F.4th 674, 683 (9th Cir. 2024) (a sentencing hearing "where youth and its attendant characteristics are considered as sentencing factors enforces the Eighth Amendment's substantive limits." (cleaned up)); *Bell v. Uribe*, 748 F.3d 857, 870 (9th Cir. 2014) ("[b]ecause the sentencing judge

[] consider[ed] both mitigating and aggravating factors under a sentencing scheme that affords discretion and leniency, there is no violation of *Miller*"); *United States v. Briones*, 35 F.4th 1150, 1156 (9th Cir. 2021) ("*Jones* clarified that a discretionary sentencing system . . . suffices to ensure individualized consideration of a defendant's youth."); *Jessup v. Shinn*, 31 F.4th 1262, 1266 (9th Cir. 2022) ("*Miller* requires, for a juvenile offender, an individualized sentencing hearing during which the sentencing judge assesses whether the juvenile defendant warrants a sentence of life with the possibility of parole.").

According to *Jones*, it is the adherence to the sentencing procedure enunciated in *Miller* – consideration of the murderer's age, "diminished culpability[,] and heightened capacity for change,*" id.* at 1316 (cleaned up) – that "helps ensure that life without parole sentences are imposed only in cases where that sentence is appropriate[.]" *Id.* at 108–112. Thus, it is the discretionary sentencing protocol itself that "help[s] make life without-parole sentences relatively rare for murderers under 18." *Id.* at 112 (cleaned up).

To ensure juvenile sentences complied with evolving federal jurisprudence, the legislature codified the *Miller* "factors" in N.C.G.S. § 15A-1340.19B. The *Miller*-fix statute "gave trial courts the discretion to determine whether juvenile murderers receive life without parole or the lesser sentence of life imprisonment with parole . . . . In making this determination, the trial court must consider certain enumerated mitigating factors along with any other mitigating factor or

circumstance." *Tirado*, slip op. at 4-5 (cleaned up).

Pursuant to the *Miller*-fix, when a juvenile has been convicted of first-degree murder on the theory of premeditation and deliberation, the sentencing court must conduct a sentencing hearing to determine whether a sentence of life without parole is warranted. N.C.G.S. § 15A-1340.19B(a)(2). At this hearing,

> [t]he defendant or the defendant's counsel may submit mitigating circumstances to the court, including, but not limited to, the following factors:
>
> (1) Age at the time of the offense.
>
> (2) Immaturity.
>
> (3) Ability to appreciate the risks and consequences of the conduct.
>
> (4) Intellectual capacity.
>
> (5) Prior record.
>
> (6) Mental health.
>
> (7) Familial or peer pressure exerted upon the defendant.
>
> (8) Likelihood that the defendant would benefit from rehabilitation in confinement.
>
> (9) Any other mitigating factor or circumstance.

N.C.G.S. § 15A-1340.19B(c). A sentencing court is required to "consider any mitigating factors" presented, and its sentencing order "shall include findings on the absence or presence of any mitigating factors and such other findings as the court deems appropriate." N.C.G.S. § 15A-1340.19C(a) (2023).

-13-

This statutory scheme "facially conform[s] to the federal constitutional case law," *State v. Conner*, 381 N.C. 643, 666 (2022), because it "provide[s] sufficient guidance to allow a sentencing judge to make a proper, non-arbitrary determination of the sentence that should be imposed upon a juvenile." *State v. James*, 371 N.C. 77, 95 (2018). The statutory language provides no presumption in favor of either potential sentence, but instead "treats the sentencing decision required by N.C.G.S. § 15A-1340.19C(a) as a choice between two equally appropriate sentencing alternatives" consistent with *Miller*. *Id.* at 90.

In its resentencing order, the sentencing court made the following findings of fact:[3]

> 1. The Court finds as the facts of the murder the facts as stated in *State v. Sims*, 161 N.C. App. 183 (2003).
>
> 2. The Court finds that the murder in this case was a brutal murder. The Court finds instructive the trial/sentencing jury's finding beyond a reasonable doubt that the murder was "especially heinous, atrocious, or cruel" pursuant to N.C.G.S. 15A-2000(e)(9). According to the trial testimony from Dr. Carl Barr, Ms. Kennedy had blunt force trauma all over her body . . . . Soot had penetrated deep into her lungs, meaning that she was alive when her car was set on fire with her in it, and she therefore died from suffocation from carbon monoxide poisoning.

---

[3] Defendant did not challenge these findings of fact, and as such, they "are deemed to be supported by competent evidence and are binding on appeal." *State v. Cobb*, 381 N.C. 161, 164 (2022) (cleaned up); *see also Cherry Cmty. Org. v. Sellars*, 381 N.C. 239, 246 (2022) (unchallenged findings are "presumed to be supported by competent evidence and are binding on appeal" (cleaned up)).

3. The Court finds that the defendant has not been a model prisoner while in prison. His prison records indicate that he has committed and been found responsible for well over 20 infractions since he has been in prison.

4. The Court finds that the defendant, although expressing remorse during the hearing, has not demonstrated remorse based on his actions and statements. During a meeting with a prison psychiatrist on January 20, 2009, the defendant complained that he was in prison and should not be. Further, the Court reviewed materials and heard evidence that as a juvenile in Florida, the defendant had been charged with armed robbery but denied any culpability in the case. Also, this Court heard and reviewed evidence that the defendant was removed from Hobbton High School in September 1998 in large part due to bad behavior. Specifically, the Court notes that defendant was accused, along with two others, of stealing from the boy's locker room after school as part of a group, but again denied doing anything wrong. The school specifically found that Sims' acts during this theft were not due to his learning disabilities. This Court notes in all three incidents, the Florida armed robbery, the Hobbton high school theft, and the murder of Ms. Kennedy, the defendant was with a group of people, and in the light most favorable to him, was at a minimum a criminally culpable member of the group but was unwilling to admit any personal wrongdoing.

5. The Court finds that Dr. Tom Harbin testified that the defendant knew right from wrong. Further, Dr. Harbin testified that the defendant would have known that the acts constituting the kidnapping [and the] murder were clearly wrong.

6. The Court finds that Dr. Tom Harbin testified that the defendant was a follower, and was easily influenced. Dr. Harbin testified that the defendant may not see himself as responsible for an act if he himself did not actually perform the act even if he helped in the performance of

-15-

the act. Further, Dr. Harbin testified that the defendant has a harder time paying attention than others and a harder time restraining himself than others. Dr. Harbin testified that the defendant had poor social skills, very poor judgment, would be easily distracted and would be less focused than others. Further, the defendant has a hard time interacting with others and finds it harder to engage others and predict what others might do.

7. The Court finds that while this evidence was presented by the defendant to try to mitigate his actions on the night Ms. Kennedy was murdered, that this evidence also demonstrates that the defendant is dangerous. Dr. Harbin acknowledge[d] on cross-examination that all of the mental health issues he identified in the defendant, taken as a whole, could make him dangerous.

8. The Court finds that the defendant was an instrumental part of Ms. Kennedy's murder. She died from carbon monoxide poisoning from inhaling carbon monoxide while in the trunk of her car when her car was set on fire. According to witness testimony at the trial, the defendant provided the lighter that Chris Bell used to light the jacket on fire that was thrown in Ms. Kennedy's car and eventually caused her death.

9. The Court finds that the evidence at trial clearly demonstrated that the defendant did numerous things to try to hide or destroy the evidence that would point to the defendant's guilt. The most obvious part is his participation in killing Ms. Kennedy, the ultimate piece of evidence against the defendants. Additionally, this defendant was the one who drove the car to its isolated last resting place in an attempt to hide it, even asking his co-defendants if he had hidden it well enough. Further, he personally went back to the car the morning after the night it was set on fire to make sure Ms. Kennedy was dead.

10. The Court finds that the physical evidence demonstrated not only his guilt, but specifically demonstrated the integral role the defendant played in

> Ms. Kennedy's death. Fingerprints, DNA, and footwear impressions at the scene where Ms. Kennedy was burned alive in her car all matched the defendant. Most notably, Ms. Kennedy died in the trunk of her car, and the palmprint on the trunk of the car, the only print found on the trunk, matched the defendant.

The sentencing court thereafter analyzed the *Miller* factors in light of the underlying facts as directed by N.C.G.S. § 15A-1340.19B. The sentencing court specifically addressed in its written order defendant's age, immaturity, ability to appreciate the risks of the conduct, intellectual capacity, prior record, mental health, familial and peer pressure, likelihood defendant would benefit from rehabilitation in confinement, and other mitigating factors and circumstances. Thus, the sentencing court complied with *Miller* when it weighed factors attendant to defendant's youth and, appreciating the discretion available, sentenced defendant to life in prison without parole.

Defendant contends, however, that his sentence violates the Eighth Amendment because the evidence showed that his role in Ms. Kennedy's murder reflects transient immaturity and that he is "not one of the exceedingly rare juveniles who are irreparably corrupt." As stated above, however, it is the adherence to the sentencing procedure enunciated in *Miller* that provides the individualized consideration of a defendant's age and attendant circumstances of youth, combined with the nature of the crime, that will "make life-without-parole sentences relatively rar[e] for murderers under 18." *Jones*, 141 S. Ct. 1318 (cleaned up). Because N.C.G.S. § 15A-1340.19B complies with *Miller* and neither sentence is presumptive, a

-17-

sentencing court is not required to apply an additional filter to ensure rarity of the sentence. Again, it is the sentencing court's exercise of discretion in light of the nature of the crime that makes a sentence of life without parole relatively rare, thus safeguarding Eighth Amendment concerns.

We also note that, contrary to the assertions in the concurrence at the Court of Appeals, the inquiry is not whether a defendant is permanently incorrigible or irreparably corrupt; nor is it potential for redemption. *See Sims*, 260 N.C. App. at 683–84 (Stroud, J., concurring). The Supreme Court in *Miller* stated that life without parole should be reserved for "the rare juvenile offender whose *crime* reflects irreparable corruption." *Miller*, 567 N.C. at 479-80 (cleaned up) (emphasis added). *Montgomery* thereafter confirmed that *Miller* prohibited life without parole "for all but the rarest of juvenile offenders, those whose *crimes* reflect permanent incorrigibility." *Montgomery*, 577 U.S. at 209 (emphasis added).

Just as the discretion invested in sentencing courts protects against what could be considered overutilization of life without parole sentences, so too the *Miller*-fix process puts the focus on the juvenile and his crimes by considering the mitigating circumstances of youth. There is no separate requirement that a sentencing court make a finding the murderer is permanently incorrigible or irreparably corrupt. We know this because the Supreme Court explicitly stated such. *See Jones*, 141 S. Ct. at 1322 ("*Miller* and *Montgomery* …[squarely rejected the argument] that the sentencer must make a finding of permanent incorrigibility…."). Thus, under *Miller*,

*Montgomery*, and *Jones*, the Eighth Amendment does not require a sentencing court to make a separate finding that a juvenile is permanently incorrigible or irreparably corrupt to impose a sentence of life in prison without parole. *See id*. at 1320 ("*Miller* did not say a word about requiring some kind of particular sentencing explanation with an implicit finding of permanent incorrigibility, as *Montgomery* later confirmed."). *See also United States v. Holt*, 116 F.4th 599, 608 (6th Cir. 2024) (In *Jones*, "the Court disavowed [defendant's] view that . . . an express incorrigibility finding before imposing a life sentence" is required.); *United States v. Briones*, 35 F.4th 1150, 1157 (9th Cir. 2021) ("permanent incorrigibility is not an eligibility criterion for juvenile LWOP" under *Jones*); *Crespin v. Ryan*, 56 F.4th 796, 799 (9th Cir. 2023) (*Jones* specifically assessed "whether a sentencer must actively find a juvenile permanently incorrigible before imposing an LWOP sentence. The Supreme Court clarified that no fact-finding requirement exists[.]" (cleaned up)); *Helm*, 112 F.4th at 687 (*Miller* "does not require that a state court's weighing of the mitigating factors associated with youth be conducted in accordance with any particular substantive criteria of incorrigibility.").

Rather, a sentencing court must simply consider youth and its attendant circumstances in light of the defendant's crime. *Miller* requires no more. Judges do not engage in predictive analytics or employ redemption anticipation algorithms to gauge whether a defendant will remain incorrigible or corrupt into his seventies; nor should we. To the contrary, sentencing courts must merely apply the straightforward

language of our *Miller*-fix statute and exercise discretion in handing down an appropriate sentence to comply with the Eighth Amendment and, by extension, Article I, § 27 of our state constitution. *See Tirado*, slip op. at 42.

Defendant, however, specifically challenges the sentencing court's *Miller* findings as to his (1) immaturity, (2) ability to appreciate the risks, (3) likelihood of benefitting from rehabilitation in confinement, (4) prior record, and (5) familial and peer pressure, and to the sentencing court's weighing of those factors. Further, defendant argues that the sentencing court disregarded mitigating evidence and improperly considered otherwise mitigating evidence in favor of a sentence of life without parole. We review each challenged finding in turn.

A sentencing court must consider the *Miller*-fix factors "in determining whether, based upon all the circumstances of the offense and the particular circumstances of the defendant, the defendant should be sentenced to life imprisonment with parole instead of life imprisonment without parole." N.C.G.S. § 15A-1340.19C(a). In addition, a sentencing court is required to enter an order which "include[s] findings on the absence or presence of any mitigating factors and such other findings as the court deems appropriate." N.C.G.S. § 15A-1340.19C(a). But, our appellate courts will not reverse a discretionary sentence "merely because the sentencer could have said more about mitigating circumstances." *Jones*, 141 S. Ct. 1321.

The Court of Appeals has properly stated that "[o]rders weighing the *Miller* factors and sentencing juveniles are reviewed for abuse of discretion." *State v. Golphin*, 292 N.C. App. 316, 322 (2024). *See also State v. Antone*, 240 N.C. App. 408, 410 (2015); *State v. Hull*, 236 N.C. App. 415, 421 (2014). Therefore, "[i]t is not the role of an appellate court to substitute its judgment for that of the sentencing judge." *State v. Lovette*, 233 N.C. App. 706, 721 (2014).[4]

   a. *Immaturity*

Defendant argues that the sentencing court disregarded mitigating evidence presented by the forensic psychologist, Dr. Thomas Harbin, that defendant was no more mature than an eight- or ten-year-old at the time of the murder. Additionally, defendant contends that the sentencing court erred by weighing defendant's immaturity as an aggravating factor rather than a mitigating factor.

The sentencing court analyzed defendant's immaturity under the *Miller*-fix statute at the time of Ms. Kennedy's murder and determined:

> The Court does not find this factor to be a significant
> mitigating factor in this case based on all the evidence

---

[4] Historically, we have stated that "on sentencing decisions appellate courts do not substitute their judgment for that of the trial court." *State v. Ysaguire*, 309 N.C. 780, 786, (1983). Thus, sentencing courts are afforded "wide latitude in determining the existence of aggravating and mitigating factors, for it . . . observes the demeanor of the witnesses and hears the testimony." *State v. Canty*, 321 N.C. 520, 524 (1988); *see also State v. Ahearn*, 307 N.C. 584, 596 (1983). Similarly, we have concluded that the weight assigned to any particular mitigating circumstance is solely the province of the sentencer. *See State v. Jaynes*, 342 N.C. 249, 285 (1995). Although these cases arose under the Fair Sentencing Act, we think this deference to the sentencing court is particularly important in light of *Miller's* insistence that discretionary sentencing and consideration of factors attendant with youth are of paramount importance. *See Miller*, 567 U.S. at 472 (emphasizing a juvenile defendant's youth as a "distinctive attribute[ ].").

presented. The Court notes that any juvenile by definition is going to be immature, but that there was no evidence of any specific immaturity that mitigates the defendant's conduct in this case.

Based upon Dr. Harbin's testimony, the sentencing court found in unchallenged finding of fact 6 that "defendant was a follower, and was easily influenced"; that "defendant has a harder time paying attention than others and a harder time restraining himself than others"; and that "defendant had poor social skills, very poor judgment, [and] would be easily distracted." These factors were the basis for Dr. Harbin's testimony regarding defendant's immaturity. The sentencing court obviously considered Dr. Harbin's testimony regarding defendant's immaturity and made relevant findings.

That the sentencing court did not make a specific finding as to defendant's alleged maturity of an eight- or ten-year-old is immaterial, as the sentencing court properly addressed evidence of immaturity, and it "need not make a finding as to every fact which arises from the evidence." *See In re A.E.S.H.*, 380 N.C. at 693 (cleaned up). Moreover, simply because a sentencing court could have said more about this mitigating circumstance is not grounds for a determination that the sentence violated the Eighth Amendment. *Jones*, 141 S. Ct. at 1321.

Further, in unchallenged finding of fact 7, the sentencing court found that "while this evidence was presented by the defendant to try to mitigate his actions . . . th[e] evidence *also* demonstrate[d] that the defendant is dangerous." (Emphasis added). Defendant argues that this finding impermissibly construed his immaturity

as an aggravating factor rather than a mitigating factor, in violation of the principle that statutory mitigating factors, if found to exist, must be given mitigating value. *See State v. Jaynes*, 342 N.C. 249, 285 (1995) (holding that if a sentencer determines that "a statutory mitigating circumstance exists, [it] must give that circumstance mitigating value."). However, the use of the word "also" by the sentencing court in this finding demonstrates that it acknowledged the existence of defendant's immaturity as a mitigating circumstance, but found that its weight, in light of the other evidence presented, was of minimal significance, and defendant has not demonstrated that the sentencing court abused its discretion. *See Golphin*, 292 N.C. App. at 44-322 ("Orders weighing the *Miller* factors and sentencing juveniles are reviewed for abuse of discretion."); *Lovette*, 233 N.C. App. at 721 ("It is not the role of an appellate court to substitute its judgment for that of the sentencing judge…."). Because the weight afforded to a mitigating circumstance is within the sound discretion of the sentencing court, defendant's contention is without merit.

  b. *Ability to Appreciate the Risks*

  Defendant next argues that the sentencing court disregarded evidence presented by Dr. Harbin that defendant was unable to appreciate the risks and consequences of his conduct at the time of the murder. Further, defendant contends that the sentencing court conflated a juvenile's ability to differentiate between right and wrong with the ability to appreciate the risks of certain conduct.

The sentencing court made the following *Miller* finding as to the mitigating nature of defendant's ability to appreciate the risks of his conduct at the time of Ms. Kennedy's murder:

> Dr. Harbin, the defendant's psychologist, testified that in spite of the defendant's diagnoses and mental health issues, the defendant would have known that the acts he and his co-defendants committed while they stole Ms. Kennedy's car, kidnapped her, and ultimately murdered her were wrong.

The sentencing court's uncontested findings of fact 5, 6, and 9 related to this *Miller* factor are binding on appeal and demonstrate that the sentencing court considered the material portions of Dr. Harbin's testimony and other evidence regarding defendant's ability to appreciate the risks associated with his conduct. The sentencing court discussed and considered that even though Dr. Harbin testified that defendant had poor judgment, defendant also understood right from wrong at the time of Ms. Kennedy's murder, and defendant understood that kidnapping, assaulting, and murdering Ms. Kennedy was "clearly wrong." Defendant's role in the murder and his attempts to conceal or destroy evidence thereafter are also indicative of defendant's ability to understand and appreciate the risks associated with his conduct.

As with defendant's argument concerning immaturity, the sentencing court was not required to make a finding as to every fact which arose from the evidence. *See In re A.E.S.H.*, 380 N.C. at 693. Simply because a sentencing court could have said more about a mitigating circumstance is not grounds for a determination that

the sentence violated the Eighth Amendment. *Jones*, 141 S. Ct. at 1321. Because there is no "formulaic checklist" or "magic-words requirement," *id.*, the sentencing court properly considered the material portions of Dr. Harbin's testimony concerning defendant's ability to appreciate the risks of his conduct at the time of the murder. Therefore, defendant's argument is without merit.

Further, we find defendant's argument that the sentencing court improperly conflated defendant's knowledge of right and wrong with his ability to appreciate the risks unpersuasive. In *Miller*, the Supreme Court stated that the ability to appreciate the consequences of conduct involves the "calculation of the risk[s] [the conduct] pose[s]" by a defendant at the time of the crime. *Miller*, 567 U.S. at 478. This is not intended to be a formulaic determination, but rather a common sense view of the evidence in light of the defendant's specific circumstances.

In addition to its finding that defendant could differentiate between right and wrong, the sentencing court found that defendant engaged in a plan to assist his co-defendant in evading a probation violation hearing. This included driving Ms. Kennedy's stolen car, throwing her in the trunk, lying to co-defendant Williams about letting Ms. Kennedy go, cleaning Ms. Kennedy's blood from the vehicle, providing Bell the lighter to start the fire that killed Ms. Kennedy, and returning to the scene to wipe down Ms. Kennedy's vehicle in an attempt to avoid detection. *See State v. Roberts*, 876 N.W.2d 863, 869 (Minn. 2016) (holding that the defendant "indicated an awareness of the consequences of his behavior when," among other things, he

"dispos[ed] of evidence"); *Cook v. State*, 242 So.3d 865, 875 (Miss. Ct. App. 2017) ("[Defendants'] efforts to cover their tracks suggested an awareness of the consequences."). Therefore, the sentencing court did not misapprehend the nature of this mitigating circumstance, and we will not substitute our judgment for that of the sentencing court. *See Lovette*, 233 N.C. App. at 721.

### c. *Likelihood that Defendant Would Benefit from Rehabilitation in Confinement*

Defendant next asserts that the sentencing court erroneously weighed his ability to be rehabilitated in favor of a sentence of life without parole. More specifically, defendant argues that the sentencing court's finding that though "defendant has seemed to do somewhat better in prison," the "rigid, structured environment" of prison will serve him best, was improper.

At the resentencing hearing, defendant testified that over the course of his thirteen years in prison, he had taken several character-education and vocational courses, competed in sports competitions, worked several jobs, obtained his GED, and had been moved down to medium custody. However, defendant also admitted that he had received thirty-nine infractions while in prison for fighting, disobeying orders, being in unauthorized locations, using profane language, possessing tobacco and contraband, and tampering with locks. Further, defendant also confirmed that during his first ten years of prison, he refused to obtain his GED despite pleas from multiple case managers, and that he told a psychiatrist that he did not believe he should be in prison. Additionally, Dr. Harbin confirmed on cross-examination that

defendant's psychological issues could make him "a pretty dangerous person," but that "being in a very structured environment would . . . tend to lessen the symptoms of [his] psychological problems."

In light of unchallenged finding of fact 2 set forth above, the sentencing court made the following *Miller* finding as to the mitigating nature of defendant's potential for rehabilitation while in confinement:

> The defendant's prison records demonstrate that the defendant has been charged and found responsible for well over 20 infractions while in prison. He consistently refused many efforts to obtain substance abuse treatment. While the defendant has in fact obtained his GED which the Court finds is an important step towards rehabilitation, the Court notes that the defendant during the first ten years plus of his confinement often refused multiple case managers pleas to obtain his G.E.D. According to prison records submitted into evidence during the February 20, 2014 evidentiary hearing, the Court notes that during a 2009 meeting with a psychiatrist the defendant noted that he was depressed in part because he was in prison and should not be. The Court finds that throughout the defendant's life he did not adjust well to whatever environment he was in. The Court finds that in recent years, the defendant has seemed to do somewhat better in prison, which includes being moved to medium custody. Most importantly to this Court, the evidence demonstrates that in prison, the defendant is in a rigid, structured environment, which best serves to help him with his mental health issues, and serves to protect the public from the defendant, who on multiple occasions in non-structured environments committed unlawful acts when in the company of others.

The sentencing court clearly considered the mitigating evidence of defendant's slight improvements and weighed that evidence against defendant's continual bad

behavior, as well as his own expert's testimony that defendant would benefit from the structured environment that prison provides. Because the weight afforded to a mitigating circumstance is entirely for the sentencing court to determine, defendant's contention is without merit.

### d. *Prior Record*

Defendant next argues that the sentencing court erred by considering two incidents which did not constitute convictions on his criminal history. These two prior incidents included (1) defendant being charged with an armed robbery offense in Florida and (2) defendant being removed from a high school after being accused of stealing from the boy's locker room with two accomplices.

Again, defendant did not challenge finding of fact 4 related to his prior record. It is therefore undisputed that defendant was charged with robbery in Florida and that he was removed from Hobbton High School in 1998, at least in part because he was accused of stealing, and the school determined the incident did not result from any learning disability he may have had. The sentencing court further noted that these two incidents were substantially similar to his actions related to the murder of Ms. Kennedy because, in each incident, defendant was part of a group, was a criminally culpable part of each group, and failed to acknowledge his wrongdoing.

Moreover, the sentencing court stated in a footnote that, in considering the robbery, it was not specifically considering the charge or any punishment, but rather

it focused on "defendant's complete denial of any wrongdoing while involved in criminal activity as part of a group."

The Court then made its *Miller* finding as to defendant's prior record:

> The defendant's formal criminal record as found on the defendant's prior record level worksheet was for possession of drug paraphernalia. However, the Court notes that because defendant was 17 ½, he had only been an adult for criminal purposes in North Carolina courts for a short period of time. The Court considers the defendant's Armed Robbery juvenile situation in Florida and the defendant's removal from high school for stealing as probative evidence in this case, specifically because both occurrences occurred when the defendant was with others, and the defendant denied culpability in Ms. Kennedy's murder and the other two incidents. The Court does not find this to be a compelling mitigating factor for the defendant.

Defendant argues that by considering the evidence of these two incidents, the sentencing court went beyond the scope of the meaning of "prior record" under N.C.G.S. § 15A-1340.19B(c)(5). However, as the Court of Appeals correctly observed, "prior record" is not defined under N.C.G.S. § 15A-1340.19B. *Sims*, 260 N.C. App. at 677. Instead, defendant requests that this Court interpret "prior record" under the statute at issue as it is defined under the Structured Sentencing Act. *See* N.C.G.S. § 15A-1340.14(a) (2023) ("The prior record level of a felony offender is determined by calculating the sum of the points assigned to each of the offenders prior convictions . . . .").

Defendant's preferred reading, however, ignores the obvious fact that it is the rare juvenile who would have prior convictions under the Structured Sentencing Act

given the presumption in favor of juvenile dispositions for delinquents. Moreover, such a reading would lead to the illogical result of precluding consideration of any delinquency adjudications under the Juvenile Code. *See* N.C.G.S. § 7B-2412 (2023) ("An adjudication that a juvenile is delinquent . . . shall n[ot] be considered conviction of any criminal offense . . . ."). This would defeat the purpose iterated in *Miller* that a sentencing court should consider a juvenile's "past criminal history." *Miller*, 567 U.S. at 479. An increase or decrease in criminal conduct would certainly be relevant to a sentencing court's determination, and limiting "prior record" only to convictions under the Structured Sentencing Act would not allow for the meaningful review of a juvenile's entire criminal history.

Moreover, the *Miller*-fix statute specifically allows a sentencing court to consider any evidence "as to any matter that the court deems relevant to sentencing, and any evidence which the court deems to have probative value may be received." N.C.G.S. § 15A-1340.19B(b). Thus, the intent of the legislature, in light of the language in *Miller*, is to allow the sentencing court to obtain, to the extent possible, a more complete picture of a defendant so that it can effectively exercise its broad discretion in sentencing juvenile murderers. Absent specific direction from the legislature that a consideration of a juvenile's "prior record" under N.C.G.S. § 15A-1340.19B only concerns convictions under the Structured Sentencing Act, we decline to read such a limitation into the statute.

Further, even if the consideration of a juvenile's "prior record" was limited to convictions, the sentencing court here did not abuse its discretion in weighing this factor. The sentencing court specifically stated that it was not "consider[ing] the charge itself or the subsequent punishment itself as evidence against the defendant," but rather, that it found both the armed robbery offense and the high school theft incident probative of defendant's tendency to be involved in group criminal conduct and then subsequently deny responsibility. Moreover, in its finding as to defendant's prior record, it noted that "defendant's formal criminal record . . . was for possession of drug paraphernalia"—not any other crime—which demonstrates that the sentencing court did not weigh the two prior incidents as substantive evidence of crimes. Rather, the sentencing court found that, in light of all the evidence presented, defendant had a tendency to be involved in group criminal activity. We find no abuse of discretion, and as discussed, the weight afforded to a mitigating factor lies within the sound discretion of the sentencing court.

### e. *Familial and Peer Pressure*

Finally, defendant contends that the sentencing court misapprehended the peer pressure mitigating factor. Specifically, defendant argues that the sentencing court erred by discounting the peer pressure factor on the basis that defendant was not "threatened or coerced," as peer pressure is more properly determined by "whether a deliberate choice made by the defendant *was influenced by his peers.*"

At defendant's trial and the resentencing hearing, evidence was presented that defendant was admonished by multiple family members and mentors that he should stay away from co-defendant Bell. Specifically, defendant's mom, sister, and his manager from Hardee's, Ms. Vickie Kurch, testified that they warned defendant to stay away from Bell, but that defendant nonetheless continued to associate with him. Further, other evidence presented at defendant's trial demonstrated that he took initiative to be involved in the plan to steal Ms. Kennedy's vehicle and ultimately kill her. Defendant told Bell that he was "down for whatever," he provided Bell with the lighter to start the fire in the car, and he personally attempted to clean up evidence of his involvement in the crime. Additionally, defendant admitted at the resentencing hearing that he personally had made "wrong choices" on the day Ms. Kennedy was murdered. On the other hand, the only evidence presented that defendant may have been susceptible to peer pressure was Dr. Harbin's testimony that defendant was "a follower" and thus could have been easily influenced.

Again, defendant did not challenge relevant findings of fact 6, 8, and 9, and those findings are binding on appeal.

In its analysis under N.C.G.S. § 15A-1340.19B, the sentencing court made the following *Miller* finding as to the familial and peer pressure defendant experienced at the time of Ms. Kennedy's murder:

> A. The Court finds that there was no familial pressure exerted on the defendant to commit this crime. In fact, the opposite is true. Sophia Strickland, Sims' mother, testified both at the trial and at the February 20, 2014

evidentiary hearing that she had warned Sims repeatedly to stay away from the co-defendant[s] in this case. Specifically, Ms. Strickland stated at the evidentiary hearing that if Sims continued to hang out with his co-defendants, something bad was going to happen. Further, Sims' sister, Tashia Strickland, also told Sims that she did not like the co-defendants, that the co-defendants were not welcome at her residence, and that Sims should not hang out with them. Also, Vicki K[u]rch, Sims' Hardee's manager, who tried to help Sims when she could, sometimes gave Sims a free ride to work, bought Sims a coat, and fed Sims' younger brother for free, warned Sims not to hang out with co-defendants, one of whom had worked for her and she knew well. The Court finds that the defendant refused to listen to his family members' warnings to stay away from the co-defendants.

B. Peer Pressure. There was no evidence in this case that Sims was threatened or coerced to do any of the things he did during the kidnapping, assault, murder, and burning of Ms. Kennedy's car. At trial, co-defendant Chad Williams stated that when Chris Bell first brought up the idea of stealing the car, Sims stated "I'm down for whatever." The only evidence that may fit in this category is Dr. Harbin's testimony that the defendant could be easily influenced. Nevertheless, the defendant made a choice to be with his co-defendants during Ms. Kennedy's murder, and actively participated in it. The evidence demonstrated that the defendant was apparently only easily influenced by his friends, but not his family who consistently told him to avoid the co-defendants. This demonstrates that the defendant made choices as to whom he would listen.

Based upon the record here, there was substantial evidence presented that defendant made deliberate decisions to be involved in this criminal activity. While taking into account Dr. Harbin's testimony that defendant was easily influenced, the sentencing court assigned little weight to this evidence, finding that "defendant was

apparently only easily influenced by his friends, but not his family who consistently told him to avoid the co-defendants."

Further, defendant's argument that the sentencing court misapprehended the meaning of "peer pressure" by discussing the lack of threats or coercion is unpersuasive, as it fails to take the entirety of the sentencing court's finding into account. The sentencing court's *Miller* finding discussed the evidence that was presented in detail, noting the absence of any threats or coercion, but more importantly, that defendant made individual and deliberate choices to participate in the crimes. Thus, the sentencing court did not abuse its discretion.

## C. Court of Appeals' Application of the Proper Standards

Defendant argues that the Court of Appeals erred by applying an abuse of discretion standard to the sentencing court's resentencing order, rather than engaging in a "meaningful analysis" of whether the sentencing court's findings supported the conclusion that defendant is irreparably corrupt. However, as discussed herein, defendant's argument is contrary to authority and is without merit.

A sentence of life without the possibility of parole for juveniles is allowed and the standard of review to be applied by our appellate courts is an abuse of discretion. Our sentencing courts stand in the best position to determine whether a specific defendant should be sentenced to life without the possibility of parole. *Miller* discusses the "rarity" of juvenile life without parole sentences, but it does not advise against applying an abuse of discretion standard. *See People v. Skinner*, 502 Mich.

89, 137 (2018) ("All crimes have a maximum possible penalty, and when trial judges have discretion to impose a sentence, the imposition of the maximum possible penalty for any crime is presumably 'uncommon' or 'rare.' "). Defendant's contention is without merit.

### III.   Conclusion

> "It is a great tragedy when a juvenile commits murder—
> most of all for the innocent victims. But also for the
> murderer, whose life has gone so wrong so early. And for
> society as well, which has lost one or more of its members
> to deliberate violence, and must harshly punish another."

*Miller*, 567 U.S. at 501 (Roberts, C.J., dissenting). The *Miller*-fix sentencing scheme satisfies federal and state constitutional concerns by requiring that sentencing courts consider a defendant's youth in mitigation and conferring discretion upon those courts to impose a punishment other than life without parole. Because it is not the role of the appellate courts to reweigh evidence on sentencing, we will generally defer to the sentencing courts on review, and the decision of the Court of Appeals is affirmed.

In addition, for reasons consistent with this Court's decision in *Bell*, defendant's *J.E.B.* claim is procedurally barred, and we affirm defendant's sentence of life in prison without parole.

AFFIRMED.

Justice EARLS concurring in the result only.

I concur in the result only. As to the *J.E.B.* issue, I concur in the result only for the reasons set out in my concurring in the result only opinion in *State v. Bell*, No. 86A02-2 (N.C. Mar. 21, 2025). *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994). As to the *Miller* resentencing issue, I concur in the result only for the reasons set forth in the Court of Appeals opinion below, *State v. Sims*, 260 N.C. App. 665 (2018). *See Miller v. Alabama*, 567 U.S. 460 (2012).

I write separately to respond to two profound errors in the majority's analysis of *Miller*'s sentencing requirements. First, the majority signals a shift in the *Miller* sentencing hearing inquiry away from the circumstances of the offender *and* his offense in favor of his offense only. That shift is inconsistent with state statutes, our precedent, and precedent of the United States Supreme Court. Second, the majority's opinion commits a perverse logical fallacy by engaging in the exact type of predictive analytics it purports to reject, threatening to mislead sentencing judges as to what is expected of them under our Constitutions.[1]

As to the first point, the majority distills the *Miller* sentencing inquiry to a singular focus on the facts of the crime. It does this implicitly in how it structures its opinion. It reiterates over ten paragraphs the sentencing court's findings of fact on the details of Sims's atrocious acts. It then devotes two sentences to its observation

---

[1] In *State v. Borlase*, No. 33A24 (N.C. Mar. 21, 2025) (Earls, J., dissenting), I address the majority's other errors related to its new standard of review and its break from Eighth Amendment jurisprudence and our precedent.

that the sentencing court made the required findings and conclusions, before it concludes that the court complied with the Eighth Amendment's requirements. (This is not because the trial court provided scarce reasoning. Quite the opposite. Its order carefully explained what evidence was presented, how the hearing proceeded, what evidence it thought was credible, and why the evidence was or was not mitigating, and spent three pages analyzing N.C.G.S. § 15A-1340.19B's requirements.) The majority also shifts the focus explicitly. In its words, "[A] sentencing court must simply consider youth and its attendant circumstances in light of the defendant's crime."

This myopic focus on the facts of the crime violates *Miller*. That case instructed that the Eighth Amendment provides substantive protections that make juvenile sentences of life without parole *rare* in light of the totality of the circumstances of the offense and the offender. We confirmed in *State v. James*, 371 N.C. 77 (2018), that the statutory scheme that implements *Miller*'s mandate was facially constitutional only because it was designed to have a sentencer analyze "*all of the relevant facts and circumstances* in light of the substantive standard enunciated in *Miller*" to decide the appropriate sentence "based upon all the circumstances of the offense and the particular circumstances of the defendant." *Id.* at 89 (first emphasis added). The offense *and* the offender are the hearing's subject. Analyzing both is how a sentencer has discretion.

*Miller* is no substantive requirement at all, however, if the offender's crime is

all that matters. In North Carolina, by the time a juvenile is even eligible for life without the possibility of parole, the juvenile must have been convicted of killing another person intentionally and in the first degree. *See Graham v. Florida*, 560 U.S. 48, 82 (2010) (forbidding under the Eighth Amendment juvenile sentences of life without parole for nonhomicide offenses); N.C.G.S. § 15A-1340.19B(a)(1) (2023) (excluding juveniles convicted of first-degree murder under a felony murder theory from life without the possibility of parole sentences). Every juvenile convicted of intentionally killing another person has by definition committed a heinous crime. It eliminates the exercise of discretion, then, to make the sentencing decision entirely dependent on whether the crime was heinous. Thus the majority's overt focus on the nature of the crime "in light of" the defendant's youth effectively revives the mandatory sentencing approach that *Miller* rejected. And the majority oversteps its appropriate role as a state's highest court by effectively overturning that Supreme Court precedent.[2]

Second, the majority asserts without a hint of irony that "[j]udges do not engage in predictive analytics or employ redemption anticipation algorithms to gauge whether a defendant will remain incorrigible or corrupt into his seventies; nor should

---

[2] The majority's reasoning is wrong to suggest that *Jones v. Mississippi*, 141 S. Ct. 1307 (2021), blessed this overt focus on the juvenile's crimes. Rather *Jones* embraced *Miller*'s core holding and observed that "life-without-parole sentences [would be] 'relatively rar[e]' for murderers under 18." 141 S. Ct. at 1318 (second alteration in original) (quoting *Miller v. Alabama*, 567 U.S. 460, 484 (2012)). Again, those eligible for this sentence are only those who committed murders while under the age of eighteen. It is among that pool—"murderers under 18"—for whom the sentence will be rare. *See id.*

we." But imposing on a juvenile a sentence of life without the possibility of parole is exactly such an exercise in "predictive analytics." In so doing, a sentencer predicts that a teenage defendant, who may live far longer within a prison's walls than they ever lived without, will never change. It is a prediction that "in 25 years, in 35 years, in 55 years—when the defendant may be in his seventies or eighties"—he will remain as dangerous as he was when he was a teenager, so that even the possibility of parole is futile and should be denied to him. *Sims*, 260 N.C. App. at 683 (Stroud, J., concurring in the result only). Science and common sense support that most people are not permanently frozen with the characteristics they exhibited as a teenager. *See Miller*, 567 U.S. at 471; *Jones v. Mississippi*, 141 S. Ct. 1307, 1340–41 (2021) (Sotomayor, J., dissenting). But a sentence of life without the possibility of parole for teenagers makes exactly the opposite prediction.

Following North Carolina's statutorily mandated procedures, the trial court made the necessary findings about Mr. Sims to support its conclusion that he is one of the rare juveniles for whom a life without parole sentence is constitutional. However, because I strongly disagree with the majority's circular reasoning and its departure from binding Supreme Court precedent, I concur in the result only.

Justice RIGGS joins in this concurring in the result only opinion.